The **FUND FOR ANIMALS**,
et al., Plaintiffs,

v.

Bruce **BABBITT**, et al., Defendants.

The **NATIONAL AUDUBON SOCIETY**,
et al., Plaintiffs,

v.

Bruce **BABBITT**, et al., Defendants.

Nos. 94–1021, 94–1106.

United States District Court,
District of Columbia.

Sept. 29, 1995.

Eric Robert Glitzenstein, Meyer & Glitzenstein, Washington, DC, for Fund for Animals.

Howard I. Fox, Sierra Club Legal Defense Fund, Washington, DC, for National Audubon Society.

Joseph R. Perella, Environmental & Natural Resources Division, U.S. Dept. of Justice, Washington, DC, for defendants.

## OPINION

PAUL L. FRIEDMAN, District Judge.

### I. BACKGROUND

Since the arrival of Europeans in North America, the grizzly bear has been eliminated from all but approximately two percent of its original range in the lower 48 states. Indeed, the bear's historic range, which once included most of the western half of the United States, has receded to small portions of Washington, Idaho, Montana and Wyoming. Grizzly Bear Recovery Plan ("Plan") at ix, 9–10, Administrative Record ("A.R.") Volume 7. Between 1800 and 1975, the grizzly bear population shrank from an estimated 50,000 bears to fewer than 1000. *Id.* at 9. It is estimated that today there are fewer than 1000 grizzlies in the lower 48 states. *Id.* at 10–11. In July of 1975, the Secretary of the Interior found that the grizzly bear is likely to become in danger of extinction within the foreseeable future. Under the authority of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, he therefore listed the

grizzly bear in the lower 48 states as "threatened" with extinction. 40 Fed.Reg. 31,734 (1975).

In these companion cases, numerous environmental and conservation organizations and several interested individuals challenge alleged deficiencies in the Secretary's efforts to fulfill his obligation under the Act to protect the grizzly bear's survival.[1] Plaintiffs, Fund For Animals ("FFA"), National Audubon Society ("NAS") and others dispute the adequacy of the recovery plan developed by the Fish and Wildlife Service ("FWS"), to whom the Secretary has delegated his day-to-day responsibilities under the ESA. 50 C.F.R. § 402.01(b). FFA and others also dispute the legality of defendants' denial of a petition requesting that defendants designate "critical habitat" for the grizzly bear.

The ESA requires that the FWS develop and implement a recovery plan "for the conservation and survival of" any threatened or endangered species. 16 U.S.C. § 1533(f)(1). Any such plan is supposed to be a basic road map to recovery, *i.e.*, the process that stops or reverses the decline of a species and neutralizes threats to its existence. Policy and Guidelines for Planning and Coordinating Recovery of Endangered and Threatened Species (May 1990) ("FWS Recovery Guidelines"), A.R. Tab 78 at 1; 50 C.F.R. § 402.02. It is supposed to provide a means for achieving the species' long-term survival in nature. FWS Recovery Guidelines, A.R. Tab 78. The Act requires that the recovery plan shall, "to the maximum extent practicable," incorporate (1) site-specific management actions necessary for the conservation and survival of the species, and (2) objective, measurable criteria by which to monitor the species' recovery. 16 U.S.C. § 1533(f)(1)(B). Plaintiffs charge that the final Grizzly Bear Recovery Plan ("GBRP"), issued in September 1993, fails adequately to set forth "site-specific management actions" or "objective, measurable criteria." They insist that the Plan will not stem or abate threats to grizzly bear survival and predict that, contrary to the intent of Congress, the GBRP will pro-

vide the "road map for the bears' forced march to extinction." NAS Mem. in Support of Summ. J. at 3. By contrast, defendants contend that the GBRP fully complies with the ESA.

In 1976, the FWS had proposed to designate "critical habitat" for the grizzlies. Proposed Determination of Critical Habitat, 41 Fed.Reg. 48,758 (1976), A.R. Tab 17. A "critical habitat" designation protects specific areas inside and outside the geographical region occupied by the threatened species if it is necessary for the conservation of the species. 16 U.S.C. § 1532(5). In 1979 the FWS withdrew its proposal because the 1978 amendments to the ESA had imposed additional obligations on the FWS before it designated critical habitat. Withdrawal of Proposals, 44 Fed.Reg. 12,382 (1979), A.R. Tab 23. In 1991 plaintiff Jasper Carlton, the director of the Biodiversity Legal Foundation, filed a petition requesting that defendants designate "critical habitat" for the grizzly bear. Letter from Carlton to Servheen of January 16, 1991, attachment at 33 ("Petition to Designate Critical Habitat"), Habitat Record ("H.R.") Tab 4. That petition was denied without the opportunity for public comment. Plaintiffs contend that the denial of Mr. Carlton's petition to designate critical habitat for the grizzly bear was not in accordance with the ESA and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

Both plaintiffs and defendants have moved for summary judgment. For the reasons stated in this Opinion, the Court concludes that defendants have met their burden with respect to incorporating site-specific management actions into the 1993 GBRP, but not with respect to incorporating objective, measurable recovery criteria. The Court also concludes that defendants acted in accordance with the APA in denying Mr. Carlton's petition for the designation of critical habitat for the grizzly bear.

## II. STATUTORY FRAMEWORK

The Supreme Court has described the Endangered Species Act as "the most compre-

---

1. Plaintiffs have standing to bring these suits. They have alleged sufficiently concrete and particularized injuries in fact that are fairly tracea-

ble to defendants' actions and redressable by the relief requested. *See Animal Legal Defense Fund, Inc. v. Espy,* 23 F.3d 496, 498 (D.C.Cir.1994).

hensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 437 U.S. 153, 180, 98 S.Ct. 2279, 2294, 57 L.Ed.2d 117 (1978). The Act was designed to "save from extinction species that the Secretary of the Interior designates as endangered or threatened." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, —— U.S. ——, ——, 115 S.Ct. 2407, 2409, 132 L.Ed.2d 597 (1995). An "endangered" species is "any species which is in danger of extinction throughout all or a significant portion of its range...." 16 U.S.C. § 1532(6). A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

In considering whether to list a species as "threatened" or "endangered", the FWS conducts a formal review in which it must consider the species' status according to five statutory factors. Those factors are:

(A) the present or threatened destruction, modification, or curtailment of its habitat or range;

(B) over-utilization for commercial, recreational, scientific, or educational purposes;

(C) disease or predation;

(D) the inadequacy of existing regulatory mechanisms; or

(E) other natural or manmade factors affecting its continued existence.

16 U.S.C. § 1533(a)(1). In listing the grizzly bear in the lower 48 states as "threatened" with extinction, the FWS relied on each statutory factor except the "disease or predation" factor. 40 Fed.Reg. 31,734.

■ Once a species is listed as threatened or endangered, the FWS "must do far more than merely avoid the elimination of [the] protected species. It must bring these species back from the brink so that they may be removed from the protected class...." *Defenders of Wildlife v. Andrus*, 428 F.Supp. 167, 170 (D.D.C.1977). The Act contains a number of provisions designed to stem the threat of extinction, promote recovery of those species found to be threatened or en-

dangered, and establish systems to conserve the species even after the threat of extinction has passed.

Concurrent with making a determination to list a species as threatened or endangered, the Secretary is required "to the maximum extent prudent and determinable" to issue regulations "designat[ing] any habitat of such species which is then considered to be critical habitat." 16 U.S.C. § 1533(a)(3)(A). The duty to make a critical habitat designation *at the same time* as the determination is made to list a species was added to the ESA in 1978. Congress excused from this requirement those species that were already listed at the time the Act was amended, specifying that "[c]ritical habitat *may* be established for [species listed prior to the amendment] ... for which no critical habitat has heretofore been established." 16 U.S.C. § 1532(5)(B). Grizzly bears are a previously listed species.

The Secretary is required in most cases, including the grizzly bear's, to "develop and implement" a "recovery plan" for each threatened or endangered species. 16 U.S.C. § 1533(f). According to the FWS, a recovery plan "delineates, justifies, and schedules the research and management actions necessary to support recovery of a species, including those that, if successfully undertaken, are likely to permit reclassification or delisting of the species." FWS Guidelines, A.R. Tab 78 at 1. The ESA directs that the plan shall, "to the maximum extent practicable," include:

(i) a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species;

(ii) objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list....

16 U.S.C. § 1533(f)(1)(B).

■ The FWS is empowered to remove listed species from the threatened or endangered lists only when the species has recovered sufficiently so that the protections of the ESA no longer are needed. 16 U.S.C. § 1533(c)(2)(B)(i). To initiate a delisting pro-

cess, the FWS must publish notice of a proposed regulation that concludes that delisting is appropriate in light of the same five factors considered for listing a species. 16 U.S.C. § 1533(a), (b), (c). After assessing all the technical or scientific data in the administrative record as they relate to the five factors, the agency must exercise its expertise in determining whether to list or delist the species. *Northern Spotted Owl v. Hodel,* 716 F.Supp. 479, 480 (W.D.Wash.1988).

## III. STANDARD OF REVIEW

■ These actions are brought under the ESA's citizen suit provision, 16 U.S.C. § 1540(g), and the Administrative Procedure Act, 5 U.S.C. § 706. Actions taken by the FWS pursuant to the ESA are reviewed as agency actions subject to the standards of review under the APA. *See Las Vegas v. Lujan,* 891 F.2d 927, 932 (D.C.Cir.1989). Under the APA, the Court must assess whether the actions of the FWS were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

■ In reviewing the action of the FWS, the Court must be thorough and probing, but if the Court finds support for the agency action, it must step back and refrain from assessing the wisdom of the decision unless there has been "a clear error of judgment." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 1861, 104 L.Ed.2d 377 (1989). In thoroughly reviewing the agency's actions, the Court considers whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the rele-

vant factors. *Marsh v. Oregon Natural Resources Council,* 490 U.S. at 378, 109 S.Ct. at 1861; *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 823–24, 28 L.Ed.2d 136 (1971); *Professional Drivers Council v. Bureau of Motor Carrier Safety,* 706 F.2d 1216, 1220 (D.C.Cir. 1983). The Court is expected to recognize the agency's expertise and experience with respect to questions involving scientific or technical matters or policy decisions based on uncertain technical information. *Marsh v. Oregon Natural Resources Council,* 490 U.S. at 375–78, 109 S.Ct. at 1859–61; *State of New York v. Reilly,* 969 F.2d 1147, 1150–51 (D.C.Cir.1992).

■ Because this case involves a challenge to a final administrative action, the Court's review is limited to the administrative record. *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).[2] Summary judgment is an appropriate procedure for resolving a challenge to a federal agency's administrative decision when review is based upon the administrative record, *Richards v. I.N.S.,* 554 F.2d 1173, 1177 n. 28 (D.C.Cir.1977), even though the Court does not employ the standard of review set forth in Rule 56, Fed.R.Civ.P.

## IV. SITE–SPECIFIC MANAGEMENT ACTIONS

### A. The Meaning of the Site–Specific Management Action Provision

■ The ESA provides that "in developing and implementing recovery plans," the Secretary and the FWS shall "to the maximum extent practicable" incorporate into each recovery plan "a description of such site-specific management actions as may be necessary to achieve the plan's goals for the conservation and survival of the species." 16 U.S.C. § 1533(f)(1)(B)(i).

**2.** Defendants have objected to plaintiff NAS's filing of a December 1993 study and a newspaper article discussing the study, both of which postdate the agency decision at issue here. Generally, review of an agency's decision "is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. at 420, 91 S.Ct. at 825. Plaintiffs claim that their submission may properly be considered as

demonstrating that the FWS failed to consider all of the relevant factors when adopting the GBRP. *See Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 285 (D.C.Cir.1981). Plaintiffs' filing does not add any new information that compels the Court to make an exception to the rule that review is limited to the record before the agency. Accordingly, the Court has not considered this submission.

Defendants interpret the "site-specific" provision to require the FWS to identify specific "sites" inhabited by grizzly bears and to describe management actions for each of these "sites." The GBRP designates several distinct geographic ecosystems or recovery zones inhabited by grizzly bears and lists management measures to be taken within each of the ecosystems. Plan at 33–37. Defendants therefore contend that the GBRP incorporates a description of "site-specific management actions." Plaintiffs, on the other hand, maintain that the ESA requires a description of *"specific" management actions, techniques or standards.* The Court's reading of the provision is consistent with defendants' interpretation.

The hyphen in "site-specific" indicates that the word "specific" modifies the word "site," not the term "management actions." The FWS has reasonably interpreted the ESA to require that the agency, in designing management actions, consider the distinct needs of separate ecosystems or recovery zones occupied by a threatened or endangered species. The Court may not reject the FWS' reasonable interpretation of the "site-specific management action" provision of the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984).

■ Resolution of that grammatical question, however, does not resolve the issue of what the "management actions" for each site must consist of. The ESA states that they must be those actions found by the agency to be "necessary to achieve the plan's goals for the conservation and survival of the species." 16 U.S.C. § 1533(f)(1)(B)(i). The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any ... species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). While Congress has repeatedly amended the recovery plan provision in order to add express direction regarding the contents of what must be included in a recovery plan, the statute does not detail specific methods or procedures that are necessary to achieve conservation and survival. *See Sier-*

*ra Club v. Lujan,* 36 E.R.C. 1533, 1993 WL 151353 (W.D.Tex.1993); S.Rep. No. 240, 100th Cong., 2d Sess. 9 (1988), *reprinted in,* 1988 U.S.C.C.A.N. 2700, 2708; FWS Guidelines, A.R. Tab 78 at 2–3. In fact, the legislative history shows that Congress recognized that a wide range of actions could be needed to conserve diverse species and the need for flexibility in choosing those actions. *See* S.Rep. No. 240, 100th Cong., 2d Sess. 9 (1988), *reprinted in,* 1988 U.S.C.C.A.N. 2700, 2709.

To be sure, the ESA suggests that methods and procedures, including scientific resources management activities—such as research, census, law enforcement, habitat acquisition and maintenance, propagation, live trapping, and transplantation—may be necessary to conserve species. 16 U.S.C. § 1532(3). But none of these methods or procedures is mandated by the Act. Moreover, while the legislative history suggests that incorporation of "site-specific management objectives" is supposed to assure that recovery plans "are as explicit as possible in describing steps to be taken in the recovery of a species," S.Rep. No. 240, 100th Cong., 2d Sess. 9 (1988), *reprinted in,* 1988 U.S.C.C.A.N. 2709, it does not delineate the content of those steps. By its silence Congress has delegated to the FWS the power to make policy choices that "represent[ ] a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute." *State of Ohio v. United States Dep't of the Interior,* 880 F.2d 432, 441 (D.C.Cir.1989) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. at 844–45, 104 S.Ct. at 2782–83 (quotation omitted)). The Court concludes that the FWS has the flexibility under the ESA to recommend a wide range of "management actions" on a site-specific basis.

*B. Application of the "Site–Specific Management Action" Requirement to the 1993 Grizzly Bear Recovery Plan*

■ Plaintiffs dispute whether the Plan even meets the FWS' interpretation of the "site-specific management action" provision because, they contend, it does not contain management actions that, even accepting defendants' reading of the statute, are specific

to particular sites. Plaintiffs point out that the management actions recommended for the various ecosystems are largely the same and are described in boilerplate statements. *See, e.g.*, Plan at 56, 77, 96 (concerning management guidelines for private and state lands); Plan at 50, 71, 90 (concerning livestock grazing); Plan at 49, 70, 89, 107 (concerning law enforcement efforts); Plan at 49, 70, 89, 107 (concerning bear baiting); Plan at 50, 71–72, 90, 109 (concerning application of Interagency Grizzly Bear Guidelines to protect from threat of resource development).

The fact that many of the management actions are the same for the different geographic ecosystems does not render the Plan unlawful. Plaintiffs have not disagreed with defendants' assertion that certain of the same biological principles apply to grizzly bear management in the various ecosystems. More importantly, where the ecosystems differ, the Plan does recommend different management actions. For example, the Plan recommends that one bear be introduced into the Yellowstone ecosystem every ten years because of the biological need for genetic diversity. Plan at 56. This recommendation is not repeated for the other ecosystems. In addition, the Plan promises to develop separate minimum habitat values for each ecosystem. Plan at 55, 76, 96, 113. The site-specificity of the effort demonstrates that the FWS considered the specific needs of each grizzly ecosystem.

■■■ Plaintiffs' greater concern is the lack of detail in the recommended management actions. Defendants' responsibility is "to the maximum extent practicable" to identify management actions "necessary to achieve the [P]lan's goals for the conservation and survival of the species." Obviously, the phrase "to the maximum extent practicable" does not permit an agency unbridled discretion. It imposes a clear duty on the agency to fulfill the statutory command to the extent that it is feasible or possible. *Doe v. Board of Educ. of Tullahoma City Schools*, 9 F.3d 455, 460 (6th Cir.1993); *SMS Data Products Group, Inc. v. United States*, 853 F.2d 1547, 1553 (Fed.Cir.1988); *Cape May Greene, Inc. v. Warren*, 698 F.2d 179, 191 (3d Cir.1983). Plaintiffs add that the ESA re-

quires that a recovery plan be both developed and *implemented*. 16 U.S.C. § 1533(f). They argue that the word "implement" would be rendered meaningless in the absence of detailed and specific management measures and that "[i]naction eviscerates the recovery planning provisions ... and amounts to an abdication of the Federal Defendants' responsibility to plan for the survival and recovery ... of endangered and threatened species." *Sierra Club v. Lujan*, 36 E.R.C. 1533, 1993 WL 151353 at *25.

The reality faced by the FWS, and alluded to in its papers, however, is that myriad factors potentially affect the grizzly bears. It is not feasible for the FWS to attempt to address each possibility. By the time an exhaustively detailed recovery plan is completed and ready for publication, science or circumstances could have changed and the plan might no longer be suitable. Thus, the FWS recognized in the Plan that it would be reviewed every five years and revised as necessary. Plan at 31. In these circumstances, the Court concludes that the FWS has provided sufficient detail to satisfy the statute.

■■■ It is not necessary for a recovery plan to be an exhaustively detailed document. Several other ESA provisions, some of which do not afford the FWS much discretion, already place limits on activities that may affect the grizzlies or empower the FWS to restrict threatening activities as needed. *See, e.g.*, 16 U.S.C. §§ 1532(a)(3)(A), 1536(a)(2), 1536(b)(4)(B)(iii), 1539(a)(2)(A). It is true that the recovery plan provision places a separate obligation on the FWS aside from those imposed by other provisions of the ESA. *See Idaho Dep't of Fish and Game v. National Marine Fisheries Service*, 850 F.Supp. 886, 895 (D.Or.1994). But the Plan's recommendations are implemented through FWS programs, cooperation and consultation with states, and the obligation of federal agencies to consult with the FWS or to implement conservation programs. *See* 16 U.S.C. §§ 1535, 1536(a)(1), (2). These programs may in many cases require the development of detailed and possibly site or situation specific restrictions to protect the grizzly bear. Because science and circumstances

change, however, the FWS needs, and the statute provides, some flexibility as it implements the recovery plan.

What the ESA requires is the identification of management actions necessary to achieve the Plan's goals for the conservation and survival of the species. A recovery plan that recognizes specific threats to the conservation and survival of a threatened or endangered species, but fails to recommend corrective action or explain why it is impracticable or unnecessary to recommend such action, would not meet the ESA's standard. Nor would a Plan that completely ignores threats to conservation and survival of a species. Here, the Court finds that the Plan does either recommend actions or recommend steps that could ultimately lead to actions to stave off the threats to the grizzly bears that have been identified.

Plaintiffs point, however, to several perceived deficiencies with the recommendations. The Court deals with these seriatim.

### 1. Hunting

Plaintiffs fault the Plan for identifying the danger to the grizzly bears posed by hunting, but merely recommending that information be circulated to hunters regarding storage of game that would be appetizing to the grizzly bears and the likely location and proper identification of grizzly bears. Plan at 49. The Plan also recommends coordination of state, federal and tribal law enforcement, that black bear hunting regulations be modified to reduce conflict with grizzly safety, and that attention be concentrated on eliminating black bear baiting in the recovery zones because it may attract grizzly bears. Plan at 48–49.

These measures do address one of the hunting concerns that was identified by the FWS when it listed the grizzly bears: humans kill grizzly bears out of fear and a perception that the bears pose a threat to human safety. *See* 40 Fed.Reg. 31,734. They also address other threats related to hunting that are recognized in the GBRP, such as food conditioning and habituation. *See* Plan at 5–7. Plaintiffs have not pointed to any place in the ESA that requires more than the recommendation of actions to coun-

ter identified threats to the grizzly bear. The choice of one particular action over another is not arbitrary, capricious or an abuse of discretion " 'simply because one may happen to think it ill-considered, or to represent the less appealing alternative solution available.' " *Hondros v. United States Civil Service Comm'n,* 720 F.2d 278, 295 (3d Cir.1983) (quoting *Calcutta E. Coast of India & E. Pakistan v. Federal Maritime Comm'n,* 399 F.2d 994, 997 (D.C.Cir.1968)). The Court will not impose plaintiffs' or its own view of a better way to stem the threat posed by hunting than the methods chosen by the FWS.

### 2. Roads

The GBRP recognizes that roads have various deleterious impacts on grizzlies. Plan at 22, 145. It recommends the standardization of road density measurement techniques through an Interagency Grizzly Bear Committee Task Force, Plan at 149; the development of actual standards for each ecosystem and their adoption into land management planning, Plan at 149; and research regarding the effects of various road densities on grizzly bear habitat use and mortality, Plan at 53. It also provides interim open road density standards. Plan at 50, 71–72, 90, 109.

According to plaintiffs, there already is sufficient scientific data to set road density standards without further delay. They argue that a promise to design site-specific management actions in the future cannot meet the ESA's requirements and that the Plan's recommendation of interim standards to protect road management options is insufficient. While plaintiffs have several objections to the content of the interim standards, the Plan recommends that the interim standards be implemented in such a manner as to maintain management options after the establishment of standards that are tailored to each ecosystem. These definite management actions address the threat posed to the grizzlies by the infiltration of roads into their habitat. The Court therefore concludes that the FWS has met its statutory responsibility. For the Court to insist that the FWS impose different road density standards would be to interfere with the agency's discretion in de-

signing management actions. *See Hondros v. United States Civil Service Comm'n*, 720 F.2d at 295.

### 3. Human Activities/Resource Development

In order to control the impact of resource development on the grizzly bear, the Plan recommends that land managers document the effect of resource development activities and apply the Interagency Grizzly Bear Guidelines to harmonize resource development with the grizzlies' needs. Plan at 21–22, 31, 47, 50–51, 71–72, 90–91, 109; *see* Interagency Grizzly Bear Guidelines ("IGB Guidelines"), A.R. Tab 236. The IGB Guidelines classify grizzly habitat into five separate Management Situations that are defined by their population and habitat conditions and the management direction for that particular habitat rather than geographically (which is how the recovery zones are classified). The management direction recommends various actions to be taken with respect to the different threats to the grizzly bears within each particular Management Situation. The most aggressive protection measures are described for Management Situation 1 and the least aggressive for Management 5.

▮ The Interagency Grizzly Bear Guidelines were established by agreement between federal, state and Canadian agencies. IGB Guidelines, A.R. Tab 236 at Preface.[3] Plaintiffs strenuously criticize both the Plan, for incorporating an external document—the IGB Guidelines—into the Plan without public comment, and the FWS for abdicating its responsibility to develop its own management actions and to make them available for public comment. 16 U.S.C. §§ 1533(f)(1), (f)(4). While it is true that the Guidelines were not separately subject to notice and comment procedures, all the released drafts of the GBRP incorporated the IGB Guidelines, and there was a sufficient opportunity to comment on each draft of the GBRP. The Court therefore finds that there has been a sufficient opportunity to comment on the incorporation of the IGB Guidelines into the Plan and the proposed management actions of the FWS. The procedures employed conformed with the ESA. *See* 16 U.S.C. § 1533(f)(4).

▮ While plaintiffs have pointed to several perceived flaws in the IGB Guidelines, they have not shown that defendants have traveled beyond the discretionary range permitted by the ESA. The GBRP identifies the threat to grizzly habitat posed by logging, mining, oil and gas development, livestock grazing, interference with grizzly dens and recreation. Plan at 7–8, 33–37, 90–91. The IGB Guidelines respond to each of these threats. Plan at 90–91; *see, e.g.*, IGB Guidelines, A.R.Tab. 236 at 7–20, 21–34, 35–39, 40–49. In addition, the Plan recommends that land managers consider the needs of the grizzlies in making management decisions and provides for ongoing monitoring of the effect of threatening activities on the grizzly bear. Plan at 91. By directly and specifically addressing the threats posed by human activities and resource development, the FWS has met its obligation under the ESA. The Court will not substitute plaintiffs' or its own view of the best way to combat such threats to grizzly survival. *See Hondros v. United States Civil Service Comm'n*, 720 F.2d at 295.

### 4. Linkage Zones

▮ Isolation of grizzly bear populations was identified in 1975 as one of the reasons for listing the grizzly bear as threatened. 40 Fed.Reg. 31,734. Linkage zones, which provide contiguous habitat of sufficient quality between the recovery zones to allow the movement of grizzly bears between the zones, are one possible means of combatting genetic isolation. Plan at 24–27. The Plan explains, however, that "[l]inkage zones are desirable for recovery, but are not essential for delisting at this time." Plan at 25; *see, also*, Plan at 24, 26, 27–28, 56. The Plan's solution is to initiate a five year study to evaluate the potential linkage between the various ecosystems. The results of the study "will be the basis for future actions regarding the linkage zone question." Plan at 25. The Plan also recommends that, in the interim,

---

**3.** The FWS is permitted under the ESA to procure the services of "appropriate public and private agencies and institutions and other qualified persons." 16 U.S.C. § 1533(f)(2).

land management agencies take precautions not to degrade the potential linkage areas. Plan at 24–26; FWS Response to Issues Raised Concerning the GBRP (January 1994) ("1994 FWS Response"), A.R. Tab 172 at 12.

Plaintiffs argue that the Plan is flawed because it does not currently protect linkage zones. It is true that the FWS recognizes linkage zones as one possible means of countering genetic isolation. Plan at 24–26. Nevertheless, the Plan explains that linkage zones are not necessary at this time and cautions that "[a]t this time, very little is known about the potential for linkage zones." Plan at 25. Defendants point out that, of 460 grizzly bears who have been radio-tracked in four different ecosystems for the past 20 years, not one of the bears has been observed moving between the ecosystems. 1994 FWS Response, A.R.Tab 172 at 12.

■■■ While the record may be interpreted differently by plaintiffs than by defendants, disagreement between scientists about the necessity of establishing linkage zones is not sufficient to demonstrate arbitrariness by the government. *Marsh v. Oregon Natural Resources Council,* 490 U.S. at 378, 109 S.Ct. at 1861; *State of New York v. Reilly,* 969 F.2d at 1150; *Mt. Graham Red Squirrel v. Espy,* 986 F.2d 1568, 1576 (9th Cir.1993). The record supports the finding that grizzly bears are not currently moving between ecosystems and, therefore, that linkage zones may

not be "necessary" at this time or may not be capable of being properly established. In addition, the Plan's recommendation that the Yellowstone grizzly population be augmented at regular intervals suggests that the FWS is not simply waiting for the results of the linkage zone study before it takes any action to combat genetic isolation. Plan at 27–28, 56.[4]

For all these reasons, the Court finds that defendants have met their obligation under the ESA to incorporate site-specific management actions into the 1993 GBRP.[5]

## V. OBJECTIVE, MEASURABLE CRITERIA FOR DELISTING

*A. The Relationship Between The "Objective, Measurable Criteria" Requirement And The Delisting Factors*

■■■ Plaintiffs' second challenge to the GBRP is based on the requirement that a recovery plan include "objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of this section, that the species be removed from the list...." 16 U.S.C. § 1533(f)(1)(B)(ii). The GBRP delineates six distinct geographic grizzly bear ecosystems in the lower 48 states. Plan at 10–11. It describes three monitoring or recovery criteria by which to measure grizzly bear population status in each ecosystem:

4. Plaintiffs accuse defendants of bowing to political and other non-scientific pressures in formulating the GBRP. As evidence, they point to the statement in the Plan that its management approach is "sensitive to the social concerns of people living in [grizzly ecosystems]," Plan at 19, and the fact that the author of the Plan, Dr. Christopher Servheen, is quoted in a newspaper article as responding to a question about the Plan's lack of linkage zone protection by saying "[t]hat's politically naive. La-la land is where you can go and make decisions like that." "US Fish & Wildlife Presents: The Grizzly Bear Mating Game," *Missoula Independent,* October 2, 1992, at 9, A.R.Tab 510 at attachment 1.

The Court rejects plaintiffs' claim that these quotations are evidence that the FWS violated the ESA's requirement that recovery plans be "based solely on the best available scientific data." 134 Cong.Rec. 19273 (1988) (Statement of Senator Mitchell). The ESA's listing and delisting factors include consideration of manmade factors affecting the species' continued existence

and overutilization of grizzly bears. 16 U.S.C. § 1533(a). These provisions demonstrate that human factors that have biological consequences for the bear are relevant considerations. In this limited manner, therefore, social consequences that might increase human-caused mortality are relevant, and consideration of such factors is not impermissible. As to Dr. Servheen's comments, their meaning is not entirely clear and the Court is not persuaded that they have the probative value that plaintiffs ascribe to them.

5. Because the Court has found that the ESA permits substantial license to the FWS in recommending site-specific management actions and that the FWS has met its burden by recommending protective actions or explaining why it is impracticable to do so for identified threats to the conservation and survival of the grizzly bears, the Court need not address plaintiffs' argument respecting the applicability of NEPA to recovery plans. *The Court rejects plaintiffs' suggestion that the FWS was improperly motivated by its desire to avoid NEPA.*

(1) the number of females with cubs seen annually over a six-year period;

(2) the distribution of females with cubs throughout the ecosystem over a six-year period; and

(3) the annual number of human-caused mortalities.

Plan at 19. The Plan specifies numerical or percentage population goals for each of these criteria within each identified grizzly ecosystem. *See* Plan at 33–34. In addition, the Plan requires the development and completion of a Grizzly Bear Conservation Strategy before the commencement of any delisting process by the FWS to ensure that adequate regulatory mechanisms will survive delisting.

Plaintiffs insist that the "objective, measurable criteria" must specifically assess whether the threats that originally led to a decision to list a species have been remedied in ways that would permit biological recovery of the listed species. Defendants dispute whether they are forced to design criteria that specifically address the five statutory listing and delisting factors, *see supra* at page 104, because, even if the recovery plan objectives are met, a species cannot be delisted without the publication of a notice of proposed rulemaking addressing the statutory factors and a public comment period. They assert that all that is required is that the GBRP's objective, measurable criteria should *likely lead* to a finding that the five statutory delisting factors are met. Defs.' Mem. in Support of Summ. J. at 29.

<span style="background:black">    </span> "Likely to lead," however, is not the language of the ESA. While the Court must defer to a reasonable agency interpretation of the dictates of the ESA, where Congress has specifically addressed an issue its intention must be given effect. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. at 843 n. 9, 104 S.Ct. at 2782 n. 9. The Court relies on the "traditional tools of statutory construction" in ascertaining Congress' intent. *Id.; State of Ohio v. United States Dep't of the Interior*, 880 F.2d 432, 441 (D.C.Cir.1989). And where Congress "has unambiguously expressed its intent ... [t]here is no room for [a different] interpretation proffered by the Department." *Legal Assistance for Vietnamese Asylum*

*Seekers v. Department of State*, 45 F.3d 469, 473 (D.C.Cir.1995).

The ESA states that the FWS "*shall,* to the *maximum extent practicable,*" incorporate into the recovery plan "objective, measurable criteria which, when met, *would* result in a determination ... that the species be removed from the list." 16 U.S.C. § 1533(f)(1)(B)(ii). The word "shall" is an imperative denoting a definite obligation. *SMS Data Products Group, Inc. v. United States*, 853 F.2d at 1553. Use of the phrase "to the maximum extent practicable" indicates a strong congressional preference that the agency fulfill its obligation to the extent that it is possible or feasible. *Id.* at 1553; *Doe v. Board of Educ. of Tullahoma City Schools*, 9 F.3d at 460. As to the word "would," it is used in the conclusion of a conditional sentence to express a contingency or possibility. *See* Webster's Third New International Dictionary 2638 (3d ed. 1993). Therefore, "would result in a determination ... that the species be removed from the list" sets a target to be aimed at by meeting the recovery goals set forth in the Plan.

Congress has spoken in clarion terms: the objective, measurable criteria must be directed towards the goal of removing the endangered or threatened species from the list. Since the same five statutory factors must be considered in delisting as in listing, 16 U.S.C. § 1533(a), (b), (c), the Court necessarily concludes that the FWS, in designing objective, measurable criteria, must address each of the five statutory delisting factors and measure whether threats to the grizzly bear have been ameliorated. *See Defenders of Wildlife v. Andrus*, 428 F.Supp. at 170; *see* H.Rep. No. 567, 97th Cong., 2d Sess. 12, *reprinted in* 1982 U.S.C.C.A.N. 2807, 2812 ("delisting should be based on the same criteria ... as listing").

**B. Application of "Objective, Measurable Criteria" Requirement To The Grizzly Bear Recovery Plan Criteria**

Defendants contend that the recovery criteria, population parameters and Conservation Strategy detailed in the GBRP actually do address all five statutory delisting factors (threat to habitat, overutilization, disease or

predation, inadequacy of existing regulatory mechanisms, other natural or manmade factors affecting existence).[6]

■ Defendants assert that the "females with cubs" and "occupancy" criteria together serve as an indicator of adequate habitat management (Delisting Factor 1). Habitat degradation and loss is acknowledged by all parties to be a significant threat to grizzly recovery. *See* Plan at 21. In listing the grizzly bear, the FWS specifically cited the diminution of the bear's range from much of the Western United States to isolated regions in a few states and the threats posed by resource development, trail construction and accessibility to livestock. 40 Fed.Reg. 31,734. In order adequately to address the first delisting factor, the "females with cubs" and "occupancy" criteria must measure the present or threatened danger to the quality and quantity of grizzly habitat, including the effect of those threats recognized in 1975.

■ There may be some rationale for concluding that minimum bear population and grizzly distribution throughout a habitat over time have a positive correlation to the quality of habitat. *But see The Fund for Animals, Inc. v. Turner,* 1991 WL 206232 at *4 (D.D.C.1991); Knight and Blanchard, "Can the status of the Yellowstone Grizzly Bear Population be determined by counting females with cubs-of-the-year," (1993), ("Knight and Blanchard Report"), A.R. Tab

258 at 8 (poor habitat quality may result in greater chances of observing bears). The "females with cubs" and "occupancy" criteria, however, fail to assess the number and distribution of bears beyond the borders of the recovery ecosystems. Plan at 17–18. Because grizzly bears inhabit more land than is included in the recovery zones, *id.,* those criteria do not measure present danger or destruction to grizzly bear habitat. Moreover, the two criteria do not seem capable of assessing the habitat of a larger, recovered grizzly bear population, let alone *threatened* habitat destruction. *See* Letter from Barbee to Servheen of February 4, 1991, A.R. Tab 337 at 4; Letter from Willcox to Servheen of February 2, 1991, A.R. Tab 386 at 4. The FWS has not explained how minimum bear population and grizzly distribution goals consider how much habitat and of what quality is necessary for recovery or how the answers to these questions can be derived from the "females with cubs" and "occupancy" criteria.[7]

Nor does the Plan's requirement that a Conservation Strategy (that will include minimum habitat values and additional monitoring methods) be *implemented* before any delisting process is commenced address this deficiency. The promise of habitat based recovery criteria some time in the future simply is not good enough. The purpose of the habitat recovery criteria is to measure the effect of habitat quality and quantity on grizzly recovery. *See* FWS Recovery Guide-

---

**6.** The GBRP explains that the purpose of the "females with cubs" criterion is to "demonstrate that a known minimum number of adult females are alive to reproduce and offset existing mortality ... [but] *is not adequate to characterize population trend or precise population size."* Plan at 20. The "distribution of females with cubs" or "occupancy" criterion is designed to "demonstrate adequate distribution of the reproductive cohort in the recovery zone.... provide evidence of adequate habitat management ... [and] indicate future occupancy by grizzly bear offspring." Plan at 20. The "human-caused mortality" criterion is part of a mortality management method that permits annual recalculation of the sustainable mortality limits for each ecosystem. Plan at 20.

**7.** Plaintiffs criticize the "females with cubs" and "occupancy" criteria for failing to consider historic habitat destruction, thereby redefining the grizzly bear habitat in its threatened state, rather than according to the bear's historic range. By

turning a blind eye to habitat restoration, plaintiffs argue, the Plan ignores what is acknowledged to be the greatest threat to the survival of the grizzly bear—habitat destruction. While destruction in the past may be relevant to assessing some of the threats to the species, the ESA only requires the recovery criteria to consider "present and threatened" danger and destruction. There does not appear in the statute any requirement that habitat loss be measured against the grizzly range during its most expansive period. Nonetheless, because past habitat loss was one of the factors specifically relied on by the FWS in listing the grizzly bear, and, because under the statute that factor alone may have been sufficient to justify listing the bear, 50 C.F.R. § 424.11(c), the FWS must consider the historic habitat loss in its assessment of the quantity and quality of grizzly bear habitat. *See Defenders of Wildlife v. Andrus,* 428 F.Supp. at 170; *see* H.Rep. No. 567, 97th Cong., 2d Sess. 12, *reprinted in* 1982 U.S.C.C.A.N. 2812.

lines, A.R. Tab 78 at I–5. Such monitoring is not possible if there is no scale against which to gauge the status of the habitat. Defendants have not met their burden to develop objective, measurable criteria by which to assess present or threatened destruction, modification or curtailment of the grizzly bear's habitat or range.

██ Defendants initially claimed that the "females with cubs" and "occupancy" criteria address the threat of disease to the grizzly bears (Delisting Factor 3, along with predation). After plaintiffs conceded that there is no current threat of disease to the grizzlies and no such threat was recognized at the time the grizzly bear was listed, however, defendants acknowledged that the criteria do not address disease. Defs.' Mem. in Support of Summ. J. at 23. As discussed above, the recovery criteria must be aimed at achieving the goal of delisting the grizzly bears and, thus, the FWS is not excused from addressing any of the five delisting factors. By wholly failing to consider whether there is a need or an appropriate means of monitoring whether disease is a threat to the grizzly bear, the FWS has failed to meet its obligation under the ESA.

██ Defendants next assert that the "human-caused mortality" criterion and the Conservation Strategy relate to the overutilization of the species and predation delisting factors (Delisting Factors 2 and 3). When the bears were listed, the FWS specifically noted that humans killed grizzly bears out of fear and a perception that the bears posed a threat to human safety and that other losses were caused by livestock predation. 40 Fed. Reg. 31,734. As to the human-caused mortality criterion, it seems to directly monitor overutilization by humans for commercial, recreational, scientific, or educational purposes. Defendants have not explained, however, how the human-caused mortality criterion addresses the threat caused by grizzly predation of livestock. As with habitat assessment, the yet-to-be-developed Conservation Strategy is not an adequate substitute for recovery criteria that measure the threat posed by livestock predation by the grizzly bear.

██ Defendants also claim that the Conservation Strategy addresses the inadequacy of the existing regulatory mechanisms factor (Delisting Factor 4). At the time the bears were listed, the FWS noted that management measures and regulation were hindered by the agencies' lack of sufficient data regarding habitat, population size, reproduction, mortality and "most importantly" annual turnover and population trends. 40 Fed. Reg. 31,734. The promise that the eventual Conservation Strategy will ensure adequate regulatory mechanisms suggests that the FWS still has not gathered sufficient data. Nonetheless, as the Conservation Strategy is not yet developed, it is paradoxical to say that it measures the inadequacy of "existing" regulatory mechanisms. Defendants have not met their obligation to develop objective, measurable criteria by which to assess the inadequacy of existing regulatory mechanisms.

██ Defendants claim that all three monitoring or recovery criteria help assess the other natural or manmade threats factor (Delisting Factor 5). In determining that the bears should be listed, the FWS specifically recognized that isolation of grizzly bear subpopulations prevented biological reinforcement of the species and that increasing human use of the national parks inhabited by the bears was detrimental to the bears. 40 Fed.Reg. 31,734. The Court finds that defendants have not explained how any of the recovery criteria considers isolation. Because isolation was one of the reasons that the grizzlies were listed in the first place, the Court agrees with plaintiffs that the FWS therefore has failed to meet its obligation under the ESA to incorporate into the GBRP objective, measurable criteria addressing genetic isolation.

### C. Scientific Validity of Monitoring Methods and Population Targets

As noted above, the Plan specifies numerical or percentage population goals for each of the three recovery criteria within each identified grizzly ecosystem, see Plan at 33–34, and, with the three recovery criteria, a methodology for monitoring whether those goals have been met. Plaintiffs object that (1) the

method of monitoring the bears' population status is unreliable and (2) the population goals are not based upon the best scientific evidence available.

■ The Plan explains that the "females with cubs" measurement "demonstrate[s] that a known minimum number of adult females are alive to reproduce and offset existing mortality in the ecosystem." Plan at 20. The FWS concedes, however, that the methodology will not gauge population "trends or precise population size. . . ." Plan at 20. Numerous grizzly bear biologists have criticized this monitoring methodology because, despite its own acknowledged limitations, it is being relied on in the Plan as the principal determinant of whether population goals have been met. *See, e.g.,* Comments from Metzgar to Servheen of January 7, 1990, ("Metzgar Comments"), A.R. Tab 439 at 2. Plaintiffs' foremost objection is that the "females with cubs" methodology is vulnerable to variable observer effort and for that reason has been criticized as unreliable and subjective. *See* Knight and Blanchard Report, A.R. Tab 258 at 7; Metzgar Comments, Tab 439 at 3. Even a report appended to the Plan acknowledges that "the application of sighting efficiency estimates [which are a base assumption of the monitoring criteria] cannot be substantiated since there is no way to assess their accuracy and they are therefore little better than guesses." Plan at 159 (Appendix C), Report of the Yellowstone Grizzly Bear Population Task Force (1988). Defendants argue (without reasonable explanation) that both under and over-intensive observer effort are accounted for by the Plan's monitoring methodology, so the grizzly bear is guaranteed appropriate protection. Defs.' Mem. in Support of Summ. J. at 15.

■ Judicial "deference to the agency is greatest when reviewing technical matters within its area of expertise, particularly its choice of scientific data and statistical methodology." *State of Louisiana ex rel. Guste v. Verity,* 853 F.2d 322, 329 (5th Cir.1988). Here, however, the Plan's own acknowledgement of the limitations of the monitoring methodology and the fact that the methodology is unreliable undermines the decision of the FWS to adopt the methodology incorpo-

rated into the Plan. The Court is unable to find in the record a rational reason for the agency's decision. The Court therefore finds that the agency failed to "explain the evidence which is available, and [failed to] offer a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturer's Ass'n v. State Farm Mutual Ins. Co.,* 463 U.S. at 52, 103 S.Ct. at 2871; *see Northern Spotted Owl v. Hodel,* 716 F.Supp. at 482. In addition, the Court notes that it has found the three recovery criteria incorporated into the Plan (females with cubs, occupancy, human-caused mortality) to be largely inadequate to meet the FWS' burden to address the ESA's delisting factors. Accordingly, the FWS must reconsider the available evidence and its decision to adopt the population monitoring methodology that it has incorporated into the GBRP.

■ Plaintiffs' second objection is that the population goals are defective. They contend that the FWS, while purporting to rely on conservation biology principles, did not properly conduct a population viability analysis in setting the goals. In other words, plaintiffs contend that defendants' results are defective and that the population targets are too low. Plaintiffs claim that the population targets in the Plan are not based on the best scientific data available and that they therefore are arbitrary and capricious.

■ Plaintiffs have painstakingly detailed the reasons why they maintain the goals are too low and have pointed to numerous studies finding that larger populations of grizzly bears than those recommended in the Plan are necessary to make the grizzly populations viable. Nonetheless, the Court must accord a high level of deference to agency judgments involving scientific matters within the FWS' area of expertise. *Mount Graham Squirrel v. Espy,* 986 F.2d at 1571; *State of Louisiana ex rel. Guste v. Verity,* 853 F.2d at 329. While deference does not require the Court to accept the population targets if there is no scientific support for them or if they are blatantly wrong, the fact that a judgment may be disputable does not render it arbitrary and capricious. *See Mount Graham Squirrel v. Espy,* 986 F.2d at 1571.

The government is entitled to rely on analyses and opinions that are non-dispositive without its decision being rendered arbitrary and capricious. *Greenpeace Action v. Franklin,* 14 F.3d 1324, 1332 (9th Cir.1992).

In this case, defendants have demonstrated that there is disagreement among experts regarding the correct population size that is necessary for viability. *See* Mark S. Boyce, "Population Viability Analysis," 23 Annu. Rev.Ecol.Syst. 481 (1992), A.R. Tabs 189; Mark S. Boyce, "Population Viability Analysis: Adaptive Management for Threatened and Endangered. Species" (1993), A.R. Tab 189A; *see also* 1994 FWS Response, A.R. Tab 172 at Attachment. The fact that there is such disagreement does not render the agency's action arbitrary and capricious, however. *Greenpeace Action v. Franklin,* 982 F.2d 1342, at 1350 (9th Cir.1992). Based on the record, the Court does not find that defendants' designation of population targets is arbitrary and capricious.

◼ Plaintiffs also criticize defendants' reliance on the existence of Canadian grizzly populations to justify low population goals, Plan at 27, because there is no evidence of the contiguity of the population and because the ESA does not apply to Canada. Moreover, the FWS itself has recognized that Canadian grizzly bears suffer the same development pressures as do United States bears. Plan at 23; 58 Fed.Reg. 43,856 (1992). The Court agrees that it appears contradictory for the FWS to concede that "bear populations in Canada immediately north of the [Cabinet/Yaak grizzly bear ecosystem] and in the Canadian portions of the Selkirk and Northern Continental Divide grizzly bear ecosystems are small," and that

"[c]ontinuing human development in areas in Canada north of these ecosystems is threatening to isolate these grizzly populations from other bear populations in British Columbia," Plan at 23, and yet still to rely on the protection posed by the contiguity of the Cabinet/Yaak and Selkirk ecosystems with Canadian grizzly bear populations. Plan at 27. The FWS has not explained how the uncontrollable threats to Canadian grizzly bears were offset in the calculation of population targets. Therefore, the FWS must explain whether reliance on the existence of Canadian bears influenced its population targets and why such reliance is reasonable.

## VI. CRITICAL HABITAT DESIGNATION

◼ Regulations issued by the Secretary of the Interior permit any "interested person" to petition the Secretary requesting designation of critical habitat. 50 C.F.R. § 424.14(a); 43 C.F.R. § 14.2. Neither the ESA nor the regulations prescribe a procedure for such petitions. Rather, they are considered under the provisions of the APA. 50 C.F.R. § 424.14(a); 43 C.F.R. § 14.2; 5 U.S.C. § 553(e).[8]

◼ The APA requires agencies to allow interested persons to "petition for the issuance, amendment, or repeal of a rule," 5 U.S.C. § 553(e), and, when such petitions are denied, to give "a brief statement of the grounds for the denial," 5 U.S.C. § 555(e). Agencies denying rulemaking petitions must explain their actions. *American Horse Protection Ass'n, Inc. v. Lyng,* 812 F.2d 1, 4 (D.C.Cir.1987). Thus, the right to petition

---

**8.** A "critical habitat" designation protects specific areas inside and outside the geographical region occupied by the threatened species if it is necessary for the conservation of the species. 16 U.S.C. § 1532(5). For those species listed after the 1978 amendments to the ESA, the FWS is required to designate critical habitat unless it finds that the benefits of nondesignation outweigh the benefits of designation. 16 U.S.C. § 1533(b)(2). For previously listed animals, such as the grizzly bear, the ESA states that "[c]ritical habitat may be established for those species ... as set forth in subparagraph (A) of this paragraph." 16 U.S.C. § 1532(5)(B). Subparagraph A defines critical habitat.

Defendants argue that the decision to designate critical habitat for a species listed prior to the 1978 Amendments is discretionary. Plaintiffs argue that the ESA's recognition of the centrality of critical habitat to the protection of species indicates that the critical habitat designation must be made even for those species listed prior to the 1978 amendments unless the benefits of non-designation outweigh the benefits of designation. 16 U.S.C. § 1533(b)(2). The Court agrees with defendants that the plain language of the ESA renders the decision to designate critical habitat a discretionary decision.

for rulemaking entitles the petitioning party to a response on the merits of the petition.

■■■■ In assessing the actions of the FWS, the Court considers whether they were "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *American Horse Protection Ass'n, Inc. v. Lyng*, 812 F.2d at 4–5. Courts ordinarily afford agencies a particularly high degree of deference regarding their decision not to initiate a rulemaking proceeding. *Id.* Such a refusal will be overturned only in the rarest and most compelling of circumstances. *WWHT, Inc. v. FCC*, 656 F.2d 807, 817 (D.C.Cir.1981). Nonetheless, the Court must assure itself that the agency "has adequately explained the facts and policy concerns it relied on, and that the facts have some basis in the record." *National Ass'n of Regulatory Utility Comm'rs v. U.S. Dep't of Energy*, 851 F.2d 1424, 1430 (D.C.Cir.1988) (citation omitted); *Professional Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1220–21 (D.C.Cir. 1983). Plaintiffs contend that the FWS reversed its course because it withdrew its 1976 proposal to designate critical habitat after the ESA was amended in 1978 and new obligations were imposed on the FWS before the designation of critical habitat. Where an agency has reversed its course, it must supply a reasoned analysis justifying the reversal. *Motor Vehicle Manufacturers Ass'n, Inc. v. State Farm Mutual Auto. Insurance Co.*, 463 U.S. 29, 57, 103 S.Ct. 2856, 2874, 77 L.Ed.2d 443 (1983).

In January 1991, as part of his comments on the first revised GBRP, Jasper Carlton, the director of the Biodiversity Legal Foundation, petitioned the FWS for a "critical habitat" designation for the four main grizzly bear ecosystems. Petition to Designate Crit-

ical Habitat, H.R. Tab 4, 5.⁹ In his petition Mr. Carlton maintained that "[d]isruption of grizzly habitat by human activities is the principal cause of the precarious status of the remaining grizzly populations." Petition to Designate Critical Habitat, H.R. Tab 4, Attachment at 33; *see* Letter from Carlton to Turner of September 12, 1991, H.R. Tab 8. He argued that the IGB Guidelines are inadequate because (1) since they are not statutes or regulations, citizens may not use the IGB Guidelines to compel action or sue for violations of the Guidelines; (2) individual agencies can avoid safeguarding the grizzly bears because the IGB Guidelines permit agencies discretion in designating the different management areas, and the level of protection afforded the different management situations varies widely; (3) the Guidelines do not provide sufficiently strong protection to those bears in the two lowest priority management situations; and (4) the national forests have been slow to incorporate the guidelines into their forest plans or have avoided the guidelines. A critical habitat designation, contended Mr. Carlton, would not only impose an obligation on all federal agencies to insure that their actions are not likely to jeopardize the continued existence of the grizzly bear, but would also mandate that federal agencies refrain from any action likely to result in the destruction or adverse modification of critical habitat. Petition to Designate Critical Habitat, H.R. 5, Attachment at 35.

■■■ In September 1992, the FWS denied Mr. Carlton's petition without either publishing the petition in the Federal Register for public comment or soliciting scientific review addressing Mr. Carlton's concerns. Letter from Morgenweck to Carlton of September 14, 1992, H.R. Tab 13.¹⁰ In denying the

---

9. In a letter dated February 20, 1991, the FWS explained that the ESA does not provide for a petition to designate critical habitat, but that his petition would be considered under the provisions of the APA. Letter from Buterbaugh to Carlton of February 20, 1991, H.R.Tab 6. On April 20, 1992, the FWS published in the Federal Register notice of Mr. Carlton's petition and its determination that it was not a petitionable action under the ESA. Petitions to Change Status of Grizzly Bear Population, 57 Fed.Reg. 14,372, 14,374 (1992).

10. Plaintiffs charge that because the FWS did not solicit comments and opinions, there is no record to support the agency's decision. *National Ass'n of Regulatory Utility Comm'n v. United States Dep't of Energy*, 851 F.2d at 1430. Under Department of the Interior regulations, if the official responsible for acting on a petition determines "that public comment may aid in consideration of the petition," he or she may initiate a comment proceeding. 43 C.F.R. § 14.4, And the APA requires an opportunity for public comment when an agency proposes rules. 5 U.S.C.

petition, the FWS acknowledged that critical habitat for a listed species should be designated to the maximum extent prudent and determinable. 50 C.F.R. § 424.12(a). FWS regulations explain that such a designation would not be prudent if identification of critical habitat can be expected to increase the degree of taking or other human activities, if it would not be beneficial to the species, or if it would be redundant. 50 C.F.R. § 424.12(a)(1). In this case, the FWS explained that recovery zones and management situations within the recovery zones were developed for the conservation of grizzly bear habitat. These zones are covered by the IGB Guidelines, with which member agencies have agreed to comply, and all federal agencies are required to consult with the FWS before carrying out permitting, leasing and selling actions in the recovery zones. For these areas, the FWS must ensure biological nonjeopardy. The FWS asserted that the current habitat protection is comparable to that of critical habitat and that designation of critical habitat would be redundant, *i.e.*, not prudent.

The FWS further explained that the current recovery zones encompass more land than a critical habitat designation likely would include. If critical habitat were designated for Management Situation 1 areas, the highest priority areas, then the current regime of regulation would likely be eliminated and protection for Management Situation 2 and 3 areas, which has been beneficial, might be deemphasized, diluted or eliminated entirely. Therefore, the FWS asserted that a critical habitat designation would not benefit the species. Finally, the FWS explained that the current management regime has achieved social acceptance and that designating critical habitat could lead to a backlash that would jeopardize recovery.

The FFA plaintiffs allege that the FWS violated the ESA by providing an inadequate explanation of its reasoning and by failing to provide a reasoned justification for the reversal of its 1976 proposal to designate critical habitat. Having considered the record in this case, the Court is satisfied, however, that the denial of Mr. Carlton's petition must be left undisturbed. The FWS adequately explained the facts and policy concerns it relied on and plaintiffs have not demonstrated that these assertions and opinions are unlawful, arbitrary, capricious or wholly irrational.

## VII. CONCLUSION

For all of these reasons, plaintiffs' motions for summary judgment are granted in part and denied in part and defendants' motion for summary judgment is granted in part and denied in part. An Order consistent with this Opinion is entered this same day.

SO ORDERED.

## *ORDER*

Upon consideration of plaintiffs' motions for summary judgment, defendants' motion for summary judgment, the responses and replies, and the administrative record, and for the reasons stated in the Opinion issued this same day, it is hereby

ORDERED that plaintiffs' motions for summary judgment are GRANTED in part and DENIED in part. Partial judgment is entered for plaintiffs on Count One of their complaint in Civil Action 94–1021. Judgment is entered for plaintiffs on Counts One and Two of their complaint in Civil Action 94–1106; it is

FURTHER ORDERED that defendants' motion for summary judgment is GRANTED in part and DENIED in part. Partial judgment is entered for defendants on Count One of the complaint in Civil Action 94–1021. Judgment is entered for defendants on Count Two of the complaint in Civil Action 94–1021. Judgment is entered for defendants on Count Three of the complaint in Civil Action 94–1106; it is

§ 553(b), (c). There is no requirement, however, in either the APA or Department of Interior regulations that the FWS must solicit comments on a decision not to propose a rule to designate critical habitat. *See* 43 C.F.R. § 14.4; 5 U.S.C. § 553(b), (c). The Court will not impose procedural requirements on the FWS that are not already required by statute or provided for by the agency's own rules. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978).

DECLARED that defendants have acted in a manner that is arbitrary and capricious and contrary to law by issuing a Recovery Plan that fails to establish objective, measurable criteria which, when met, would result in a determination, in accordance with the provisions of the Endangered Species Act, that the grizzly bear be removed from the threatened species list; and it is

FURTHER ORDERED that this matter is remanded to the Fish and Wildlife Service, which has 90 days from the date of this Order to reconsider those portions of the 1993 Grizzly Bear Recovery Plan that have been found to be contrary to the dictates of the Endangered Species Act.

SO ORDERED.