# COLLEGES AND UNIVERSITIES

**PROCUREMENT – STATE PERSONNEL – SERVICE CONTRACTS – PREFERENCE FOR STATE EMPLOYEES – MEANING OF A PROVISION REQUIRING CERTAIN UNIVERSITIES TO HAVE POLICIES THAT PROMOTE THE PURPOSES OF § 13-402 OF THE STATE PERSONNEL & PENSIONS ARTICLE AND THAT ARE, TO THE MAXIMUM EXTENT PRACTICABLE, SIMILAR TO § 13-218.1 OF THE STATE FINANCE & PROCUREMENT ARTICLE**

January 11, 2022

*The Honorable Maggie McIntosh*
*House of Delegates of Maryland*

You have requested our opinion on two questions related to Senate Bill 342 of 2016 ("S.B. 342"). *See* 2016 Md. Laws, ch. 65, codified at Md. Code Ann., State Fin. & Proc. ("SFP") § 11-203(e)(4). That legislation imposed two requirements on the University System of Maryland ("USM"), Morgan State University ("Morgan State"), and St. Mary's College of Maryland ("St. Mary's College") (collectively, "the Universities"). First, it required the Universities to have certain policies that "promote the purposes" of § 13-402 of the State Personnel and Pensions Article ("SPP"), a provision which establishes a preference for using State employees, rather than private contractors, to perform certain services in State-operated facilities. Second, it required that the Universities' policies must, "to the maximum extent practicable, be similar" to § 13-218.1 of the State Finance and Procurement Article, which establishes a notice-and-conferral requirement before the issuance of a solicitation for certain service contracts. In light of those requirements, you asked about what obligations S.B. 342 places on the Universities with respect to their procurement policies. You also asked whether, and to what extent, the Universities' current policies comply with S.B. 342's requirements.

As to your first question, there are both procedural and substantive requirements that the Universities must meet. Procedurally, S.B. 342 requires the Universities to amend their *procurement* policies—not implement the necessary changes through some other means—and have those amendments approved by the Board of Public Works ("BPW"). *See* SFP § 11-203(e)(3).

Substantively, the Universities' amended policies must "promote the purposes" of SPP § 13-402 by implementing a process for evaluating service contracts that is sufficiently similar—as determined by the BPW—to the process that most

3

other units of State government use to implement the preference for State employees articulated in SPP § 13-402. That process, codified at SPP § 13-405, generally requires other units of State government to consider alternatives to a proposed service contract, to compare the cost of the contract with the cost of using State employees and show savings over a threshold amount, to prepare a plan of assistance for affected employees, and to make the contract subject to an audit. To be clear, however, the Universities have flexibility to develop a process that is not identical to SPP § 13-405 and that meets each of their unique needs, so long as that process is similar enough to SPP § 13-405 to promote the same purposes, namely, to protect State employees from layoffs associated with outsourcing when feasible and cost-efficient to do so, as well as to prevent the State from paying more for services that State employees are available to perform. In addition, under S.B. 342, the Universities' policies must, "to the maximum extent practicable, be similar" to SFP § 13-218.1 by providing affected employees with advance written notice of a proposed service contract and a reasonable opportunity to meet and discuss alternatives to the contract.

As to your second question, although USM addressed S.B. 342 in a separate non-procurement policy and Morgan State and St. Mary's College did so in their respective collective bargaining agreements with their employees, none of the Universities amended their procurement policies and submitted them to the BPW for approval. As a procedural matter, then, our opinion is that none of their current policies comply with S.B. 342. As a substantive matter, the BPW is the proper entity to evaluate, in the first instance, whether a particular policy complies with S.B. 342, but we can nonetheless provide some general observations below in response to your request.

# I
# Background

## A. *University Procurements*

USM, Morgan State, and St. Mary's College are generally exempt from Division II of the State Finance and Procurement Article—the State's general procurement law. *See* SFP § 11-203(e)(2); *see also* Md. Code Ann., Educ. ("ED") §§ 12-112(a) (establishing exemption for USM), 14-109(b) (same for Morgan

State), 14-405(f) (same for St. Mary's College).[1] Their procurements instead must "comply with the policies and procedures developed by the University or Baltimore City Community College and approved by the Board of Public Works and the Administrative, Executive, and Legislative Review Committee of the General Assembly." SFP § 11-203(e)(3).[2] Still, the Universities' policies are expected to align with the general procurement law in certain respects. More specifically, their policies shall:

> (i) to the maximum extent practicable, require the purchasing of supplies and services in accordance with Title 14, Subtitle 1 of [the State Finance and Procurement Article];
>
> (ii) promote the purposes of the regulations adopted by the Department of General Services governing the procurement of architectural and engineering services;
>
> *(iii) promote the purposes of § 13-402 of the State Personnel and Pensions Article*;
>
> *(iv) to the maximum extent practicable, be similar to § 13-218.1 of [the State Finance and Procurement Article]*; and

---

[1] The General Assembly recently exempted Baltimore City Community College ("BCCC") from the general procurement law as well. *See* 2021 Md. Laws, ch. 732, codified at ED § 16-505.3. In doing so, the General Assembly required BCCC, like the Universities, to adopt policies that reflect the provisions cross-referenced in SFP § 11-203(e)(4), including policies that promote the purposes of SPP § 13-402 and are similar, to the maximum extent practicable, to SFP § 13-218.1. Because BCCC is not part of your request, however, we do not address it further.

[2] As our Office has previously advised, to the extent State law makes the Universities' procurement policies contingent on approval by the Administrative, Executive, and Legislative Review ("AELR") Committee, that would likely constitute an impermissible legislative veto. *See, e.g.*, Letter of Attorney General J. Joseph Curran, Jr. to Governor Parris N. Glendening (May 11, 1999) (bill review letter associated with USM's exemption from procurement law); Letter of Attorney General J. Joseph Curran, Jr. to Governor Robert L. Ehrlich, Jr. (May 4, 2004) (same for Morgan State); Letter of Attorney General J. Joseph Curran, Jr. to Governor Robert L. Ehrlich, Jr. (April 20, 2006) (same for St. Mary's College). Thus, although both the BPW and the AELR Committee may be required to *review* the Universities' procurement policies, only the BPW can be required to *approve* them.

> (v) to the maximum extent practicable, require the procurement of food in accordance with Title 14, Subtitle 7 of [the State Finance and Procurement Article].

SFP § 11-203(e)(4) (emphases added).[3]  Because the third and fourth items on that list were added by S.B. 342, they are the focus of this opinion.  *See* 2016 Md. Laws, ch. 65.  We will address the cross-referenced provisions in each of those two items in turn.

> 1.  *Section 13-402 of the State Personnel and Pensions Article*

S.B. 342 requires the Universities' policies to "promote the purposes of § 13-402 of the State Personnel and Pensions Article." SFP § 11-203(e)(4)(iii).  Section 13-402 creates a statutory preference for using State employees, rather than private contractors, to perform certain services in State-operated facilities. That is, it declares that "[t]he policy of this State is to use State employees to perform all State functions in State-operated facilities in preference to contracting with the private sector to perform those functions."  SPP § 13-402.  For those units of State government that are subject to SPP § 13-402, the preference for State employees is implemented through a set of procedures for the evaluation, certification, and approval of service contracts.  A "service contract" is defined by the statute as "a procurement contract for services that: (1) will be provided to a unit in the Executive Branch of State government; (2) will be performed within a State-operated facility; and (3) in the estimation of the procurement officer, will exceed an annual cost of $100,000."  SPP § 13-401(b).[4]

Under those procedures, "[a] service contract," as defined, "may be entered into only as approved by the Board of Public Works."  SPP § 13-403(a).  The BPW, in turn, may only approve a service contract if it receives certification from the Department of

---

[3] For the sake of completeness, we note that the Universities' procurement policies must also "promote the purposes of the State procurement law as set forth in § 11-201 of the State Finance and Procurement Article."  ED §§ 12-112(a)(2)(ii), 14-109(b)(2)(ii), 14-405(f)(2)(ii).  We do not address those more generalized purposes here.

[4] To be clear, not all contracts for services will qualify as "service contracts" under this definition.  Given that the preference for State employees is "to use State employees to perform all State functions *in State-operated facilities*," SPP § 13-402 (emphasis added), the statutory scheme applies only to contracts for services that will be performed within State-operated facilities.

Budget and Management ("DBM")[5] that either the contract is exempt from the general preference for State employees stated in SPP § 13-402 or the unit seeking to enter into the contract has complied with the requirements set forth in SPP § 13-404(c), which include following the process for evaluating service contracts in SPP § 13-405. *See* SPP § 13-403(b). A service contract is exempt from the general preference for State employees if:

> (1) State employees are not available to perform the services;
>
> (2) a conflict of interest would result if a State employee were to perform the services;
>
> (3) the nature of the services meets the standards set by [DBM] for emergency appointments;
>
> (4) the services are incidental to the purchase or lease of personal property or real property, such as a service agreement that is part of the purchase or rental of computers or office equipment; or
>
> (5) a clear need exists to obtain an unbiased finding or opinion, such as an expert witness in litigation.

SPP § 13-404(b). In addition, "[i]f the General Assembly authorizes or requires that certain services be performed by an independent contractor, the Board of Public Works may approve a service contract for those services without the certification" from DBM that is ordinarily required. SPP § 13-403(c).

For service contracts that are not exempt from the preference for State employees, a unit must comply with the process in SPP § 13-405 by submitting three pieces of information to DBM. *See* SPP § 13-404(c)(1). The first is "a demonstration that the unit has

---

[5] As a result of procurement reform, as of October 1, 2019, the Department of General Services replaced the Department of Budget and Management as the control agency for the procurement of service contracts. *See* 2017 Md. Laws, ch. 590, codified at SFP § 12-107(b)(2). It is our understanding, however, that DBM still handles certification of service contracts for compliance with Title 13, Subtitle 4 of the State Personnel and Pensions Article. *See* SPP §§ 13-404 (requiring the "Department" to certify service contracts), 1-101(f) ("Unless expressly provided otherwise, 'Department' means the Department of Budget and Management.").

taken formal and positive steps to consider alternatives to the service contract, including reorganization, reevaluation of service, and reevaluation of performance." SPP § 13-405(b). The second is a calculation that "compare[s] the cost of the service contract with the cost of using State employees" and "show[s] savings to this State, over the duration of the service contract, of 20% of the contract or $200,000, whichever is less." SPP § 13-405(c)(1). The third is "a formal plan of assistance for all State employees who will be adversely affected by the service contract." SPP § 13-405(d)(1). That plan of assistance must include: "(i) efforts to place affected employees in vacant positions in the unit or in another unit; (ii) provisions in the service contract, if feasible, for the hiring by the contractor of displaced employees; and (iii) prior notification to affected employees in accordance with [SFP] § 13-218.1," a provision that we will discuss in more detail in the next section. SPP § 13-405(d)(2). Finally, if the unit complies with this process and the service contract is certified by DBM[6] and approved by the BPW, the contract is then "subject to a legislative audit to determine compliance with projected cost savings." SPP § 13-405(e).

> 2.   *Section 13-218.1 of the State Finance and Procurement Article*

S.B. 342 also provides that the Universities' policies must, "to the maximum extent practicable, be similar to § 13-218.1 of [the State Finance and Procurement Article]." SFP § 11-203(e)(4)(iv). Section 13-218.1, for its part, sets a notice-and-conferral requirement. More specifically, it requires that "[a]t least 60 days before the issuance of a solicitation for a service contract that is not exempt [from the preference for State employees stated in SPP § 13-402], the unit shall provide the exclusive representative of the employees who may be affected by the service contract with . . . written notice" and "a reasonable opportunity to meet and discuss alternatives to the proposed service contract." SFP § 13-218.1(b). The written notice must identify the "work that is being proposed for contracting" and the "contracting procedures, requirements, timetables, and employee rights as provided in Title 13, Subtitle 4

---

[6] DBM may certify a service contract only if DBM also finds that: (i) the potential economic advantage of entering into the contract is not outweighed by the preference stated in SPP § 13-402; (ii) the contract does not adversely affect the affirmative action efforts of the State; (iii) the contract includes adequate control mechanisms to ensure that the services will be performed in accordance with the service contract; and (iv) the contract complies with all of the requirements of Division II of the State Finance and Procurement Article. SPP § 13-404(c)(2).

of the State Personnel and Pensions Article," SFP § 13-218.1(b)(1)(i), i.e., the provisions that we just discussed in the prior section.

## B. *Legislative History of S.B. 342*

S.B. 342 was introduced in 2016 after the General Assembly was advised that a similar bill enacted the prior year might not have applied to the Universities, despite at least some legislators' apparent expectation that it would. *See* Floor Report, House Health & Gov't Operations Comm., S.B. 342, 2016 Leg., Reg. Sess. During the prior year, the General Assembly had passed House Bill 158 ("H.B. 158"), which added the requirement (now codified at SFP § 13-218.1(b)(1)) that a unit of State government seeking to enter into a service contract that is not exempt from the preference for State employees must provide the exclusive representative of employees who may be affected by the service contract with "a reasonable opportunity to meet and discuss alternatives to the proposed service contract." 2015 Md. Laws, ch. 403. Section 13-218.1 had already required the unit to provide written notice at least 60 days before the issuance of a solicitation for a service contract. But, with H.B. 158, the General Assembly repealed and reenacted subsection (b)(1), thus requiring notice *and* conferral. *Id*.

H.B. 158 also amended SPP § 13-405. At the time, that provision already required, among other things, that units calculate the cost of a proposed service contract, compare it to the cost of using State employees, and show savings to the State over the duration of the contract of 20 percent of the contract or $200,000, whichever is less. SPP § 13-405(c)(1). The new addition under H.B. 158 made service contracts entered into after that comparison of costs "subject to a legislative audit to determine compliance with [those] projected cost savings." 2015 Md. Laws, ch. 403, codified at SPP § 13-405(e). In making that addition, the General Assembly repealed and reenacted the entirety of SPP § 13-405, adding the audit provision to the existing prerequisites for certification by DBM, that is, the requirement to consider alternatives to a proposed service contract, to compare the cost of the contract with the cost of using State employees and show specified savings over a threshold amount, and to include a plan of assistance for State employees affected by the contract. *See* SPP § 13-405(b), (c), (d).

Of particular relevance here, H.B. 158 also included an uncodified provision requiring that "any unit in the Executive Branch of State government with an independent personnel system shall adopt rules or regulations similar to the provisions of Section

1 of this Act," which had repealed and reenacted, with amendments, parts of SFP § 13-218.1 and the entirety of SPP § 13-405. 2015 Md. Laws, ch. 403, § 2. Because the Universities have independent personnel systems, *see* ED §§ 12-111(a) (USM), 14-104(h)(2) (Morgan State), 14-408(a)(1) (St. Mary's College), that uncodified provision was understood by many to apply to them. At some point after H.B. 158's passage, however, questions arose as to whether the bill in fact applied to the Universities. That is because St. Mary's College took the position that, based on the general autonomy granted to the Universities by statute, a specific reference to the Universities was necessary to make them subject to the bill. *See* Floor Report, House Health & Gov't Operations Comm., S.B. 342, 2016 Leg., Reg. Sess.; *see also* ED §§ 12-104 (providing USM authority over its own management, subject to "restriction[s] imposed by law by *specific reference* to [USM]") (emphasis added), 14-104 (same for Morgan State), 14-404 (same for St. Mary's College).[7] Thus, S.B. 342 was introduced the next year—and made specific reference to the Universities—to "remove all doubt." Floor Report, House Health & Gov't Operations Comm., S.B. 342, 2016 Leg., Reg. Sess.

## C.   *The Universities' Current Policies*

USM adopted procurement policies and procedures in 1999, with the approval of the BPW, and revised those policies in 2016. *See* University System of Maryland Procurement Policies and Procedures (July 1, 2016). Although its revisions did not address S.B. 342, USM recently adopted a separate policy that incorporates elements of S.B. 342. *See* University of Maryland Board of Regents, VIII-22.00 Policy on Service Contracts (May 1, 2020). The purpose of that policy is to "[a]rticulate the USM's preference to use institution employees to continue providing institution services, unless the use of an external service contract is justified by cost or other reasons that cannot be addressed through alternative means." *Id.* The policy states that a USM institution will "[a]t least 60 days before advertisement of a solicitation for a service contract . . . share a written proposal to use a service contract with . . . [p]otentially affected employees, including the exclusive representative as appropriate" as well as with "[t]he

---

[7] Attorneys in our Office weighed in at the time on these issues, and there was some uncertainty expressed about whether H.B. 158 in fact applied to the Universities. But we have not analyzed any further the question of whether H.B. 158 would have applied to the Universities on its own and reach no conclusion on the matter here, because such an analysis is unnecessary to respond to your request regarding S.B. 342.

[USM] Chancellor." *Id.*[8] The institution will then, "[a]t the request of the Chancellor or the employees . . . meet to discuss the proposal." *Id.* Under USM's policy, each such proposal must include:

(1) A description of the work to be done under the service contract;

(2) The justification for proposing a service contract, including, as appropriate:

(a) Reasons why the Services cannot reasonably be performed effectively by institution employees (e.g., conflict of interest, emergency need, services incidental to a real or personal property acquisition);

(b) Estimated cost savings, including a comparison of the costs of using USM employees versus entering into a service contract[; and]

(c) Other benefits of the service contract, including the business needs that the service contract will meet.

(3) An explanation of the steps that the institution has taken to consider alternatives to the service contract.

(4) The institution's plan of assistance for employees affected by the service contract, including:

(a) Efforts to place employees within the institution or USM;

(b) Service contractor provisions for hiring displaced employees; and

(c) Other measures to minimize the impact of the service contract on affected employees.

---

[8] USM is made up of twelve constituent institutions: Bowie State University; Coppin State University; Frostburg State University; Salisbury University; Towson University; University of Baltimore; University of Maryland, Baltimore; University of Maryland, Baltimore County; University of Maryland, College Park; University of Maryland Eastern Shore; University of Maryland Global Campus; and University of Maryland Center for Environmental Science.

*Id*. Lastly, the policy states that "[t]he Chancellor will develop procedures for the review of service contract proposals." *Id*.

The Chancellor's procedures, in turn, state that, "[d]epending on the circumstances as assessed by the Chancellor," a decision as to whether the proposal will be submitted to the Board of Regents will be communicated at least 30 days before a solicitation for a service contract. Procedures for Satisfying the Requirements of Board of Regents Policy VIII-22.00 Policy on Service Contracts. If the decision is made to submit the proposal to the Board of Regents, the proposal will be "shared with the Committee on Finance initially, which will make a recommendation to the full Board of Regents for a decision as to whether to proceed or not." *Id*.

Morgan State adopted procurement policies and procedures in 2005, with approval from the BPW. *See* Morgan State University Procurement Policies and Procedures (Sept. 21, 2005). Although its policies have not been revised since then, and no separate policy has been promulgated, Morgan State has incorporated elements of S.B. 342 into its collective bargaining agreement with its employees. *See* Memorandum of Understanding between American Federation of State, County, and Municipal Employees (AFSCME) and Morgan State University (Mar. 1, 2018 to June 30, 2020) ("Morgan State MOU"). That agreement reads, in pertinent part:

> Article XXIV – Contracting Out
>
> The University recognizes the integrity of the bargaining unit and shall make good faith efforts to use bargaining unit employees to perform non-exempt job functions in preference to contracting out with the private sector . . . . Where the University decides to contract out for services the University will, to the maximum extent practicable, provide the Union with written notice of the proposed outsourcing at least sixty (60) days before the issuance of a solicitation for the service contract and will be available to meet upon written request from the Union within a reasonable time after the request is made, to discuss the impact on the bargaining unit and to discuss alternatives to the service contract. The notice shall include a statement of the scope of work to be included in the service contract and identify which employees, if any

> are known, who will have their employment materially affected as a result of the contracting out of services. Employees who are laid off are subject to Article XXI – Layoff and Recall.

*Id.* at 30.

St. Mary's College adopted procurement policies and procedures in 2006, with the approval of the BPW, and revised those policies in 2018. St. Mary's College of Maryland Procurement Policies and Procedures (May 3, 2018). Although its revisions did not address S.B. 342, St. Mary's College took a similar approach to Morgan State and incorporated elements of S.B. 342 into its collective bargaining agreement. *See* Memorandum of Understanding between St. Mary's College of Maryland and American Federation of State, County, and Municipal Employees (Mar. 26, 2019 through Mar. 26, 2022) ("St. Mary's College MOU"). That agreement reads, in pertinent part:

> Section 8.01: Integrity of the Bargaining Unit:
>
> Unless otherwise provided by law, the College recognizes the integrity of the bargaining unit and will act consistently with the current statutory policy to use State Employees to perform all State functions in State operated facilities in preference to contracting out with the private sector. In the event the College proposes to use non-bargaining unit individuals to displace continuing bargaining unit Positions, it will provide the Union with notice at the earliest opportunity, but normally at least sixty (60) days in advance and will be available to meet upon written request from the union within ten (10) days after the request is made. For the purpose of this Section, the College shall be considered a State-operated facility.
>
> Section 8.02: Contracting Out/Outsourcing:
>
> A: Notification
>
> If the College proposes to layoff or otherwise displace employees in the bargaining unit by outsourcing to the private sector a function currently performed by

employees in the bargaining unit, the College shall provide the union with written notice at its earliest opportunity, but normally no later than sixty (60) days in advance of the publication of the RFP [request for proposals] and IFB [invitation for bids], unless circumstances require shorter notice. Emergency procurements shall be subject to these same notifications.

This notice shall contain:

(1) an explanation of the College's reason(s) for its outsourcing proposal,

(2) a listing of the number of employees, department(s), location(s), position(s), and names of employees that the College anticipates its outsourcing proposal would affect upon implementation[,] and

(3) an accounting of the projected cost of the service contract as opposed to the cost of using College employees.

The College shall send [a] copy of the RFP or IFB prior to publication.

B: Meeting to Discuss the Union's Proposal

The union may make a written Request to the Director of Human Resources to meet to discuss the reasons for outsourcing (the "Request"). Within seven (7) calendar days of receipt of the Request, the Vice President of the affected department or his or her designee (the "VP") shall meet with the union in order to discuss the reasons for outsourcing. Following that meeting, the union may request a meeting with the VP to present a written proposal to the College detailing the specific benefits associated with the continued employment of the current College employees rather than outsourcing, improvements that could be realized by changing existing practices or methods, and the union's and the affected employees' commitment to demonstrating the benefits and putting into practice these improvements cited in the union's proposal. If the union requests such a

> meeting, it shall occur within three (3) weeks
> of the meeting referred to in the above
> paragraph.

*Id*. at 10-11.

## II
## Analysis

### A. *The Universities' Obligations Under S.B. 342*

Your first question is what obligations S.B. 342 places on USM, Morgan State, and St. Mary's College. To answer that question, "we look first to the language of the statute, giving it its natural and ordinary meaning. We do so on the tacit theory that the General Assembly is presumed to have meant what it said and said what it meant." *Sabisch v. Moyer*, 466 Md. 327, 350 (2019) (citation omitted). Of course, "[t]he plain language of a provision is not interpreted in isolation. Rather, we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect." *Chow v. State*, 393 Md. 431, 448 (2006) (citations omitted). We may rely on legislative history to resolve any ambiguities in the statute, *see, e.g.*, *Blackstone v. Sharma*, 461 Md. 87, 119-20 (2018), but even in the absence of ambiguous language, we may look to the legislative history in order to confirm an interpretation of the statute's text, *see, e.g.*, *Neal v. Baltimore City Bd. of Sch. Comm'rs*, 467 Md. 399, 415-16, 424 (2020).

#### 1. *Procedural Obligations*

We first consider the Universities' procedural obligations under S.B. 342. The text of the statute is clear, at least as to its directive that the Universities must adopt certain policies and procedures. The statute first provides that "[a] procurement by a University . . . shall comply with the *policies and procedures* developed by the University . . . and approved by the Board of Public Works and the Administrative, Executive, and Legislative Review Committee of the General Assembly." SFP § 11-203(e)(3) (emphasis added).[9] The statute then provides later in the very same

---

[9] Although SFP § 11-203(e)(3) seemingly makes the Universities' procurement policies subject to approval by both the BPW and the AELR Committee, only the BPW can be required to approve those policies. *See* footnote 2, *supra*. That said, the Universities must still submit their policies to the AELR Committee for review and comment, even if approval is not required.

subsection that "[t]he *policies* of a University . . . shall," among other things, "promote the purposes" of SPP § 13-402 and "to the maximum extent practicable, be similar" to SFP § 13-218.1. SFP § 11-203(e)(4) (emphasis added). On the statute's face, therefore, the "policies" referenced in SFP § 11-203(e)(4) appear to be the same as the procurement "policies" mentioned earlier in the same subsection that must be approved by the BPW. *See, e.g.*, *Whack v. State*, 338 Md. 665, 673 (1995) ("When a word susceptible of more than one meaning is repeated *in the same statute or sections of a statute*, it is presumed that it is used in the same sense." (emphasis added)).

We recognize that, at the time S.B. 342 was enacted, this provision read slightly differently, stating that "[a] University's policies shall" reflect the cross-referenced provisions, rather than that "the policies" of a University must do so. 2016 Md. Laws, ch. 65. Although the phrase "a University's policies," when read in isolation, may seem less specific than "*the* policies of a University," such that *any* policy adopted by the University might suffice, the statute's context and legislative history make clear that the statute, even at that time, referred to the *procurement* policies that have to be approved by the BPW.[10] For example, the other items that were listed in SFP § 11-203(e)(4) at the time and that were required to be reflected in the Universities' "policies"—i.e., the purchasing of supplies and services and the procurement of architectural and engineering services—unquestionably related to procurement and clearly needed to be in the procurement policies submitted to the BPW for approval. In fact, those requirements were enacted at the same time USM received its exemption from the general procurement law. *See* 1999 Md. Laws, ch. 515. That reinforces our sense that the relevant "policies" referred to in SFP § 11-203(e)(4) are the procurement policies the Universities must submit to the BPW for approval. After all, if the General Assembly intended for the Universities to adopt a separate set of policies to comply with the new requirements under S.B. 342, without oversight from the BPW, the Legislature presumably would have codified that requirement elsewhere, rather than as part of a list of other items that unquestionably had to be included in the Universities' *procurement* policies. *See State v. Bricker*, 321 Md. 86, 93 (1990) ("It is presumed that the General Assembly acted

---

[10] The current language, which provides that "[t]he policies of a University *or Baltimore City Community College* shall" reflect the cross-referenced provisions, appears to be nothing more than a grammatical change made to accommodate the addition of BCCC. 2021 Md. Laws, ch. 732 (emphasis added). We therefore read the 2016 and 2021 language the same way.

with full knowledge of prior legislation and intended statutes that affect the same subject matter to blend into a consistent and harmonious body of law.").

Indeed, the legislative history of S.B. 342, as reflected in the floor report for the bill, confirms that the law was intended to "require[] that the *procurement policies* adopted by [the Universities] reflect provisions in State law related to the use of State employees rather than outside contractors." Floor Report, House Health & Gov't Operations Comm., S.B. 342, 2016 Leg., Reg. Sess. (emphasis added). The clear text of S.B. 342, read in context and in conjunction with the legislative history, thus obligates the Universities to amend their procurement policies to reflect the two items added by S.B. 342 and submit those policies to the BPW for approval.

From a policy perspective, we also doubt that the General Assembly intended to treat the two items S.B. 342 added to SFP § 11-203(e)(4) differently from the other items that are required to be reflected in the Universities' procurement policies. *See Frost v. State*, 336 Md. 125, 137 (1994) (recognizing that statutes should be analyzed "to avoid constructions that are illogical, unreasonable, or inconsistent with common sense"). It makes little sense to require some parts of SFP § 11-203(e)(4) to be reflected in the Universities' BPW-approved policies and not others. Although S.B. 342 in some respects deals with personnel matters, which the Universities might understandably have viewed as more appropriate for a separate personnel policy, the legislation establishes prerequisites to enter into a "service contract," that is, "a *procurement* contract for services," SPP § 13-401(b) (emphasis added), and thus effectively adds new steps to the Universities' *procurement* procedures.[11]

---

[11] In fact, the preference for State employees stated in SPP § 13-402 was originally codified in the State's general procurement law. 1984 Md. Laws, ch. 566. Then, a year after its enactment, it was transferred to Division II of the new State Finance and Procurement Article, 1985 Md. Laws, ch. 12, only to be transferred to "Article 64A – Merit System" the following year, 1986 Md. Laws, ch. 840. Finally, in 1993, it was transferred to the new State Personnel and Pensions Article, 1993 Md. Laws, ch. 10, where it has remained ever since, although it was renumbered once, 1996 Md. Laws, ch. 347. In each instance, we have found no indication of a substantive change, and thus the provision appears to have a deep connection to procurement even though it resides in the State Personnel and Pensions Article. In fact, for those units of State government subject to SPP § 13-402, the provisions of that subtitle are essentially treated as steps in the procurement process. *See* SPP § 13-

To be sure, if H.B. 158—enacted in 2015—had applied to USM, Morgan State, and St. Mary's College, the Universities likely would not have had to revise their BPW-approved policies. Instead, they would simply have had to "adopt rules or regulations" that were "similar" to what H.B. 158 required, presumably without any involvement by the AELR Committee or the BPW. 2015 Md. Laws, ch. 403, § 2; *see also* ED §§ 12-104(j)(2) (providing USM a general exemption from the Administrative Procedure Act, including the procedure for adoption of regulations), 14-104(d)(3) (same for Morgan State), 14-404(c)(2) (same for St. Mary's College). It is also true that when S.B. 342 was enacted in 2016, its lead sponsor described it to committee members as merely a "corrective bill that explicitly includes what we thought was in last year's bill," that is, H.B. 158. *Hearing on S.B. 342 Before the Senate Educ., Health, and Envtl. Affairs Comm.*, 2016 Leg., Reg. Sess. (Feb. 16, 2016) (statement of Sen. Feldman).

But while the primary intent of the 2016 legislation may have been to codify the *substantive* requirements of the uncodified language from 2015, the language of the 2016 legislation makes clear that the General Assembly also intended to add a new *procedural* requirement—the BPW's approval. And even if the language were not clear, there are other indications that confirm the intent to require the BPW's approval for the Universities' amended policies. For instance, one of the floor reports explained that, under current law, the Universities are "required to develop *procurement policies* that are approved by the Board of Public Works," and that S.B. 342 added requirements to the "*procurement policies* developed by [the Universities]." Floor Report, Senate Educ., Health, and Envtl. Affairs Comm., S.B. 342, 2016 Leg., Reg. Sess. (emphases added). Similarly, the title of the 2016 bill also stated that the bill "requir[es] that certain *policies* of public senior higher education institutions promote certain purposes and be similar to certain provisions," not that the institutions adopt *rules or regulations*, as had been the expectation under H.B. 158. S.B. 342, 2016 Leg., Reg. Sess. (emphasis added). In light of these written statements, legislators voting on the bill would likely have understood that it required new items to be added to the procurement policies that the BPW must approve. For all of these reasons, our opinion is that S.B. 342 obligates the Universities to

---

404(c)(2) (providing that DBM may certify a service contract subject to SPP § 13-402 only if, among other things, the unit has complied with SPP § 13-405 and "the service contract complies with all of the requirements of Division II of the State Finance and Procurement Article").

update their procurement policies and submit them to the BPW for approval.

### 2. Substantive Obligations

Of course, S.B. 342 does not merely require the Universities to develop procurement policies; it specifies where, and to what extent, those policies must reflect other provisions of law. We next consider, therefore, the Universities' substantive obligations under S.B. 342. As discussed above, under that legislation, the Universities' procurement policies must "promote the purposes" of SPP § 13-402 and "to the maximum extent practicable, be similar" to SFP § 13-218.1. SFP § 11-203(e)(4). Notably, that language does not make the Universities "subject to" those two cross-referenced provisions. *Compare* SFP § 11-203(e)(5) (listing several provisions of the general procurement law that "apply" to the Universities, and not listing SPP § 13-402 or SFP § 13-218.1), *with* SFP § 11-203(e)(4). Instead, it gives them discretion to develop procurement policies, subject to the BPW's approval, that meet their unique needs while also meeting S.B. 342's objectives. We thus focus on what guideposts can be gleaned from the language and legislative history of the statute to determine how much discretion the Universities have in satisfying their statutory obligations.

### a. Section 13-402 of the State Personnel and Pensions Article

We start with what it means to "promote the purposes" of SPP § 13-402. That provision declares that "[t]he policy of this State is to use State employees to perform all State functions in State-operated facilities in preference to contracting with the private sector to perform those functions." SPP § 13-402. Before we can determine what sort of policies might "promote the purposes" of SPP § 13-402, however, we must identify those purposes. We will thus trace the origins of this provision.

Section 13-402 of the State Personnel and Pensions Article dates back nearly forty years*, see* 1984 Md. Laws, ch. 566, and the text of the provision has remained essentially unchanged since then. Enacted in 1984, the provision was just one part of a broader bill codifying the recommendations of the Governor's Committee on Contracting for Services. *See* Report of House Committee on Appropriations, S.B. 781, 1984 Leg., Reg. Sess. (Apr. 6, 1984). The bill not only established the preference for State employees codified in SPP § 13-402 but also implemented that preference with

a detailed statutory scheme that had "[v]arious exemptions and safeguards" built into it, *id.*, namely, the remainder of Title 13, Subtitle 4 of the State Personnel and Pensions Article.

As for exemptions, the bill provided that the BPW could approve a service contract without regard to the preference for State employees if, for example, State employees were "not available to perform the necessary services." Report of Senate Constitutional & Public Law Comm., S.B. 781, 1984 Leg., Reg. Sess. As for safeguards, the bill required a unit seeking to enter into a service contract to submit "data showing that the services provided under the contract will be less costly than if performed by State employees" and "a formal plan for assisting State employees who will be affected adversely by the service contract." *Id.* The stated purpose of the bill, as a whole, was "to insure that the services of State employees are used whenever feasible and cost-efficient." *Id.*

When viewed in its historical context, the preference for State employees in SPP § 13-402 and the related statutory scheme were intended to give "consistent guidance to the various segments of State Government in their approach to and evaluation of the process of contracting out services." S.B. 781, 1984 Leg., Reg. Sess. (written testimony of the Department of Budget and Fiscal Planning). Representatives of State employees testified in favor of the preference, explaining that, in the short run, "contracting out . . . resulted in the layoff" of State employees and, in the long run, using private contractors cost taxpayers as much or more than using State employees because "[o]nce contractors are 'in solid', they frequently raise their prices and the State is stuck as it no longer is equipped to perform the service." S.B. 781, 1984 Leg., Reg. Sess. (Feb. 21, 1984) (written testimony of the Maryland Classified Employees Association). The preference for State employees stated in SPP § 13-402 thus appears to have two related purposes: to protect current State employees from layoffs associated with outsourcing when it is feasible and cost-efficient to do so and also to prevent the State from paying more for services that its employees are available to perform.

We return now to the text of S.B. 342, which requires the Universities' procurement policies to "promote the purposes" of SPP § 13-402. Because the purposes of that provision could be promoted in any number of ways, the text of S.B. 342 is ambiguous as to what precisely is required to be included in the Universities' policies. Such broad language provides the Universities a fair amount of discretion. But that discretion is not unlimited, and we rely on the legislative history to identify, with more specificity,

how the Universities are supposed to "promote the purposes" of SPP § 13-402.

As discussed above, the lead sponsor of S.B. 342 described the bill as a "corrective bill that explicitly includes what we thought was in" H.B. 158. *Hearing on S.B. 342 Before the Senate Educ., Health, and Envtl. Affairs Comm.*, 2016 Leg., Reg. Sess. (Feb. 16, 2016) (statement of Sen. Feldman); *see also* Floor Report, House Health & Gov't Operations Comm., S.B. 342, 2016 Leg., Reg. Sess. (observing that H.B 158, enacted the prior year, was "clearly intended to direct [the Universities] to do the same things" that S.B. 342 does). For its part, H.B. 158 would have required the Universities to "adopt rules or regulations similar to the provisions of Section 1 of this Act." 2015 Md. Laws, ch. 403, § 2. Section 1 of H.B. 158, in turn, repealed and reenacted (with amendments) parts of SFP § 13-218.1, which establishes a notice-and-conferral requirement before the issuance of a solicitation for a service contract, and the entirety of SPP § 13-405, which sets forth the process used by most other units of State government to evaluate service contracts. 2015 Md. Laws, ch. 403, § 1. So H.B. 158, assuming it had applied to the Universities, would essentially have required them to adopt rules "similar" to those in SFP § 13-218.1 and SPP § 13-405. *See* Floor Report, House Appropriations Comm., H.B. 158, 2015 Leg., Reg. Sess. (describing the process for evaluation of service contracts and noting that the Universities "will have to adopt similar procedures as those for other Executive Branch agencies").

Given that the apparent purpose of S.B. 342 was to include what had been in the prior year's H.B. 158 (and given that the requirement in H.B. 158 for the Universities to have procedures similar to SFP § 13-218.1 was separately carried over to S.B. 342), this history suggests that what it means to "promote the purposes" of SPP § 13-402 must be informed by SPP § 13-405—the other provision to which the Universities' procedures would have needed to be "similar" under H.B. 158. In other words, the General Assembly apparently expected that the Universities would "promote the purposes" of SPP § 13-402 by adopting policies and procedures that are generally similar to those in SPP § 13-405, the provision that implements the preference for State employees articulated in SPP § 13-402.

In fact, much of the lead sponsor's explanation of S.B. 342 was spent summarizing SPP § 13-405. In addition to describing

how the General Assembly had sought to have the Universities adopt "similar" provisions to H.B. 158 a year earlier, he stated:

> Under current law if you want to outsource . . . you've got to meet with the representative of the affected employees, you've got to consider alternatives to the outsourcing, you've got to actually calculate the savings, there's got to be 20 percent or $200,000 in savings that can be demonstrated, and then if it's outsourced, and this was something that was added last year, the contract is subject to being audited to make sure that in fact the savings that are being represented on the front end actually are realized.

*Hearing on S.B. 342 Before the Senate Educ., Health, and Envtl. Affairs Comm.*, 2016 Leg., Reg. Sess. (Feb. 16, 2016) (testimony of Sen. Feldman).  That statement describes several of the core "safeguards"[12] that are included in SPP § 13-405 and that operate together "to insure that the services of State employees are used whenever feasible and cost-efficient."[13]  As such, in our view, S.B. 342 seems to require the Universities to "promote the purposes" of SPP § 13-402 by implementing a process for evaluating service contracts that is generally similar to SPP § 13-405.

We recognize, of course, that the language of S.B. 342 as enacted does not expressly reference SPP § 13-405.  It is also true that the General Assembly knew how to require the Universities' procurement policies to be "similar" to another provision of law, *see, e.g.*, SFP § 11-203(e)(4)(iv); H.B. 158, 2015 Leg., Reg. Sess., and did not expressly do so here.  The legislative history does not indicate why the General Assembly chose the language it did— why it chose to require the Universities' policies to "promote the purposes" of SPP § 13-402, rather than to simply be "similar" to SPP § 13-405.[14]  Whatever the reason, the legislative history of

---

[12] Report of House Committee on Appropriations, S.B. 781, 1984 Leg., Reg. Sess. (Apr. 6, 1984).

[13] Report of Senate Constitutional & Public Law Comm., S.B. 781, 1984 Leg., Reg. Sess.

[14] One possible explanation is that the bill drafter, in an attempt to make clear that the Universities were covered by the bill (thus remedying the issue that arose with H.B. 158 a year earlier), borrowed existing language from SFP § 11-203(e)(4).  That is, in the very same subsection

S.B. 342 is clear that SPP § 13-405 was intended as a guide for how the Universities would "promote the purposes" of the preference for State employees. But the language of the statute, which focuses on the purposes behind the preference, also makes it clear that each University has flexibility to develop its own process that departs from SPP § 13-405 in some ways so long as the process is similar enough to promote the same purposes.[15]

We thus turn to SPP § 13-405 for guidance as to when the Universities' policies might sufficiently "promote the purposes" of the statutory preference for State employees. As a preliminary matter, SPP § 13-405 applies only to "service contracts," as defined in that subtitle. *See* SPP § 13-401(b) (defining "service contracts" to exclude contracts for services that are not performed within a State-operated facility and that will not exceed an annual cost of $100,000). Because we doubt that the General Assembly—in requiring only policies that "promote the purposes" of SPP § 13-402—intended to impose stricter requirements on the Universities than on units of State government that are actually subject to SPP § 13-402, the Universities' policies would not need to apply to contracts for services that will not be performed within State-operated facilities or that will cost $100,000 or less.

Similarly, SPP § 13-405 outlines a process only for evaluating service contracts that are "not exempt" from the preference for State employees. *See* SPP § 13-405(a) (referring to the exemptions

that was amended by S.B. 342, the Universities' procurement policies had already been required to "*promote the purposes* of the regulations adopted by the Department of General Services governing the procurement of architectural and engineering services." SFP § 11-203(e)(4)(ii) (emphasis added). The law also already required the Universities' procurement policies more generally to "promote the purposes" of the State's procurement law. ED §§ 12-112(a)(2)(ii) (USM), 14-109(b)(2)(ii) (Morgan State), 14-405(f)(2)(ii) (St. Mary's College). In light of the unique history of the requirement in S.B. 342, we do not decide whether "promote the purposes" has exactly the same meaning in those other related contexts as it has in this context.

[15] Indeed, for what it is worth, that is how representatives from the American Federation of State, County, and Municipal Employees ("AFSCME") described S.B. 342 when testifying alongside the lead sponsor in support of the bill. *See Hearing on S.B. 342 Before the House Gov't Operations Comm.*, 2016 Leg., Reg. Sess. (Mar. 30, 2016) (written testimony of AFSCME) (explaining that S.B. 342 "directs the universities to adopt policies similar to provisions that every other agency must comply with while still maintaining flexibility to adopt a policy that fits the needs of each institution").

in SPP §§ 13-403(c) and 13-404(b)). Section 13-405 thus recognizes that its safeguards do not apply under some circumstances, such as when "State employees are not available to perform the services." SPP § 13-404(b). Again, because we doubt that the General Assembly intended to impose stricter requirements on the Universities than on units of State government that are subject to SPP § 13-402, the Universities can likely include similar types of exemptions in their procurement policies. *Cf.* SPP §§ 13-403(c) and 13-404(b). With that in mind, we now turn to the process for evaluating service contracts that are not exempt.

Before entering into a non-exempt service contract, units of State government that are subject to the statutory preference for State employees must comply with the four core elements of SPP § 13-405. First, units must demonstrate that they have considered alternatives to the service contract. SPP § 13-405(b). This element advances the purposes of the statutory preference by ensuring that feasible and cost-efficient ways to use State employees are explored before outsourcing occurs. Second, units must compare the cost of the service contract with the cost of using State employees and show specified savings to the State. SPP § 13-405(c). This element not only prevents the State from paying more for services that its employees are available to perform but also requires a level of savings that would justify departing from the statutory preference for State employees (and thereby protects State employees from layoffs when feasible and cost-efficient). Third, units must prepare a formal plan of assistance for State employees who will be adversely affected by the service contract. SPP § 13-405(d). This element advances the purposes of the statutory preference by identifying feasible and cost-efficient ways that State employees could be used even if outsourcing occurs. Fourth, units must make the service contract subject to an audit to determine compliance with projected cost savings. SPP § 13-405(e). This element operates as a check on whether a service contract that displaced State employees was actually cost-efficient, as is required to overcome the statutory preference. Once units have complied with this process, DBM decides whether to certify the contract, and if the contract is certified by DBM, it is then submitted to the BPW for final approval. *See* SPP § 13-403.

For the Universities, the question is how similar their procurement policies should be to that process. On one end of the spectrum, if the Universities' policies include provisions largely similar to each of the four core elements of SPP § 13-405, their policies are very likely to "promote the purposes" of SPP § 13-402. After all, the core elements of SPP § 13-405 were presumably

designed by the Legislature to promote what it saw as the purposes behind the preference for State employees. But the Universities' policies need not be *identical* to SPP § 13-405, and whether they are similar enough to that provision so as to promote the purposes of SPP § 13-402 is ultimately a decision for the BPW. Again, although the legislative history of S.B. 342 suggests that the Universities are required to implement a process for evaluating service contracts that is generally similar to SPP § 13-405, the Universities retain discretion to depart from the process in SPP § 13-405 so long as the process remains similar enough to promote the underlying purposes of the preference for State employees. That is, the elements of the process must operate together to ensure that State employees are used, rather than outside contractors, when feasible and cost-efficient for the Universities, considering the Universities' unique needs. Ultimately, though, it is up to the BPW to decide what is sufficiently similar to promote the purposes of SPP § 13-402.

> b. *Section 13-218.1 of the State Finance and Procurement Article*

We now turn to the additional requirement in S.B. 342 that the Universities' policies must, "to the maximum extent practicable, be similar" to § 13-218.1 of the State Finance and Procurement Article. SFP § 11-203(e)(4)(iv). The word "similar" is ordinarily understood to mean "having a likeness or resemblance, esp[ecially] in a general way." *Webster's New Universal Unabridged Dictionary* 1782 (2003); *see also Seipp v. Baltimore City Bd. of Elections*, 377 Md. 362, 373-74 (2003) ("The word 'similar' does not mean identical but that which resembles."). As with SPP § 13-402, therefore, S.B. 342 gives the Universities some discretion to develop procurement policies of their own that resemble SFP § 13-218.1. But the word "similar" in the statute is also qualified by the phrase "to the maximum extent practicable," which limits that discretion to a significant degree. *See Fund for Animals v. Babbitt*, 903 F. Supp. 96, 107 (D.D.C. 1995) ("Obviously, the phrase 'to the maximum extent practicable' does not permit an agency unbridled discretion. It imposes a clear duty on the agency to fulfill the statutory command to the extent that it is feasible or possible.").[16] As a result, the Universities have less discretion when developing policies that are, "to the maximum extent practicable," similar to SFP § 13-218.1 than when developing processes for evaluating service contracts that are

---

[16] *But see Maryland Dep't of the Env't v. County Comm'rs of Carroll County*, 465 Md. 169, 211 & n.38 (2019) (recognizing that the phrase can be a "term of art" in some contexts).

similar enough to SPP § 13-405 to promote the purposes of SPP § 13-402.

Although the Maryland courts have not interpreted the phrase "to the maximum extent practicable" in this context, what is "practicable" varies with the circumstances. *See, e.g.*, *State v. Peterson*, 315 Md. 73, 88 (1989) ("[T]he phrase 'whenever practicable' is flexible and depends upon the particular circumstances pertinent to the case."); *Robey v. Broersma*, 181 Md. 325, 341 (1943) ("But these words, 'as soon thereafter as practicable,' are of a relative and dependent character, to be controlled more or less by the circumstances of the case, and by no means furnish a definite and fixed rule." (citation omitted)); *see also Black's Law Dictionary* (11th ed. 2019) (defining "practicable" as "reasonably capable of being accomplished; feasible in a particular situation"). Here, however, the General Assembly has required the Universities' policies to be similar to SFP § 13-218.1 "*to the maximum extent* practicable," SFP § 11-203(e)(4)(iv) (emphasis added), which leaves relatively little discretion. This aspect of S.B. 342 thus provides the Universities with some flexibility to meet their unique needs but requires them to align their procurement policies with SFP § 13-218.1 to the extent that doing so is at all practicable.

To understand what that means requires a brief overview of SFP § 13-218.1. The crux of that provision is the requirement that a unit of State government that is subject to the general procurement law must communicate with its employees' collective bargaining unit. More specifically, at least 60 days before the issuance of a solicitation for a service contract, the unit must provide the exclusive representative of the employees who may be affected by the service contract with written notice and, since the enactment of H.B. 158, a reasonable opportunity to meet and discuss alternatives to the service contract. SFP § 13-218.1(b)(1). It is clear, then, that the Universities must similarly give affected employees advance written notice and a reasonable opportunity to meet and discuss alternatives. Although the timeline need not necessarily be identical (i.e., 60 days), S.B. 342 obligates the Universities to include in their procurement policies a notice-and-conferral requirement that resembles this statutory timeline if at all practicable. That is, if the Universities depart from that timeline in their policies, they must be able to explain why there was no practicable way to provide 60 days' notice.

Section 13-218.1 also requires the written notice to identify the "work that is being proposed for contracting" and the

"contracting procedures, requirements, timetables, and employee rights as provided in Title 13, Subtitle 4 of the State Personnel and Pensions Article."[17]  The Universities' policies must therefore provide for a similar notice.  Although the second part of this notice provision raises the question of how the Universities' policies must reflect Title 13, Subtitle 4 of the State Finance and Procurement Article, that question was answered in Part II.A.2.a above:  the written notice under SFP § 13-218.1 must identify the University's process for evaluating service contracts, a process that must generally be similar (but need not be identical) to the one in SPP § 13-405.  Indeed, the statutory language of SFP § 13-218.1 (and its express cross-reference to Title 13, Subtitle 4 of the State Personnel and Pensions Article) reinforces our conclusion above that the General Assembly intended the Universities' policies under S.B. 342 to be generally similar to those in SPP § 13-405.

## B.  The Universities' Compliance with S.B. 342

Your second question is whether the Universities' current policies comply with S.B. 342's requirements.  As a procedural matter, given our conclusion that S.B. 342 requires the Universities to update their procurement policies and submit them to the BPW for approval, none of the Universities' current policies fully comply with S.B. 342.  Although each of the Universities took action in response to S.B. 342, the statute requires them to develop procurement policies that reflect each of the items required by SFP § 11-203(e)(4) and then to submit those policies to the BPW for approval.[18]  But none of the Universities updated their procurement

---

[17] We recognize that, under the rule of the last antecedent, there is an argument that this provision is referring only to the "employee rights as provided in Title 13, Subtitle 4 of the State Personnel and Pensions Article," and that the "contracting procedures, requirements, [and] timetables" to which it refers might be located elsewhere in the Maryland Code.  *See, e.g.*, *United Bank v. Buckingham*, 472 Md. 407, 425-26 (2021) ("[A] qualifying clause ordinarily is confined to the immediately preceding words or phrase—particularly in the absence of a comma before the qualifying phrase.").  But in this context—where Title 13, Subtitle 4 of the State Personnel and Pensions Article governs more than just employee rights—it seems more likely that the qualifying clause modifies every element in the list.

[18] Earlier this year, the General Assembly added another item that the Universities must incorporate into their procurement policies.  *See* 2021 Md. Laws, ch. 32.  Their policies must now, "to the maximum extent practicable, require the procurement of food in accordance with Title 14, Subtitle 7 of [the State Finance and Procurement Article]."  SFP § 11-

policies in that manner. Instead, USM adopted a separate policy approved only by the Board of Regents, while Morgan State and St. Mary's College incorporated elements of S.B. 342 into their respective collective bargaining agreements.

As for the substance of the Universities' current policies, the BPW is the proper entity to evaluate, in the first instance, whether a particular policy complies with S.B. 342. But we can nonetheless provide some general observations in response to your request. As an initial matter, it appears that each of the Universities has at least articulated a preference for State employees. USM, for example, has expressed a "preference to use institution employees to continue providing institution services, unless the use of an external service contract is justified by cost or other reasons that cannot be addressed through an alternative means." University of Maryland Board of Regents, VIII-22.00 Policy on Service Contracts (May 1, 2020). Meanwhile, Morgan State has agreed to "make good faith efforts to use bargaining unit employees to perform non-exempt job functions in preference to contracting out with the private sector." Morgan State MOU at 30. And St. Mary's College has similarly agreed to "act consistently with the current statutory policy to use State Employees to perform all State functions in State operated facilities in preference to contracting out with the private sector." St. Mary's College MOU at 10.

The extent to which the Universities have implemented a process for evaluating service contracts that is similar to SPP § 13-405, however, is mixed. Morgan State's collective bargaining agreement, for example, does not appear to incorporate any of the core elements of SPP § 13-405 that would ordinarily "promote the purposes" of SPP § 13-402, except that—as separately required by S.B. 342's cross-reference to SFP § 13-218.1—the University "will be available to meet upon written request . . . to discuss alternatives to the contract." Morgan State MOU at 30. St. Mary's College, for its part, requires "an accounting of the projected cost of the service contract as opposed to the cost of using College employees," though its agreement does not explain how to determine whether the service contract justifies departing from the ordinary preference for State employees and does not appear to

---

203(e)(4)(v). That subtitle establishes the Certified Local Farm Enterprise Program in the Department of Agriculture. Although this new requirement is not part of your request, our conclusion that updates to the Universities' procurement policies under SFP § 11-203(e)(4) must be submitted to the BPW for approval would apply with equal force to this new provision.

explicitly incorporate any other elements that might be similar to those in SPP § 13-405. St. Mary's College MOU at 11.

USM's policy sets forth the most detailed process and explicitly incorporates many of the core elements of SPP § 13-405. *See* University of Maryland Board of Regents, VIII-22.00 Policy on Service Contracts (May 1, 2020). For example, for those contracts that are covered by the policy, USM requires "[a]n explanation of the steps that the institution has taken to consider alternatives to the service contract" and a "justification" for the service contract that contains "[e]stimated cost savings, including a comparison of the costs of using USM employees versus entering into a service contract," as well as a "plan of assistance for employees affected by the service contract." *Id.*

In your request, you suggested three specific ways that a University's policy might not sufficiently "promote the purposes" of SPP § 13-402, using USM's policy as an example. First, you suggested that the Universities might be required not only to articulate a preference for using State employees for services that State employees are currently performing but also for services that were already contracted out in the past or for new services that no contractor or employee is yet performing. More specifically, you stated that USM's policy to "use institution employees to *continue* providing institution services" might have created an exemption that does not exist in SPP § 13-402, which provides more broadly that "[t]he policy of this State is to use State employees to perform all State functions in State-operated facilities in preference to contracting with the private sector to perform those functions."

To be clear, for those units that are subject to SPP § 13-402, although there does not appear to be any categorical exception from the preference for contracting out entirely new services or for the renewal of contracts for services that have already been outsourced, the preference does not always apply to such contracts. Rather, the applicability of the preference in those circumstances depends on the specific facts. For example, for those agencies subject to SPP § 13-402, there is usually a threshold question as to whether State employees are available to perform the service; if they are not (which we suspect would often be the case in these situations), then the contract is exempt from the preference. *See* SPP § 13-404(b). The Universities would, at the very least, be entitled to have a similar exemption in their policies, and the way that USM worded its preference might have been intended to incorporate that type of exemption. To the extent, however, that there are some situations at the Universities when State employees are available to perform

the services covered by either an existing service contract that is up for renewal or a contract for entirely new services, it will be up to the BPW to decide whether application of the statutory preference for State employees in those situations would be necessary to "promote the purposes" of SPP § 13-402.

Second, you suggested that the Universities might need to require that their service contracts show cost savings over the same specific threshold mandated by SPP § 13-405 (which USM's policy, for example, does not currently do). That provision requires most other units of State government to "show savings to this State, over the duration of the service contract, of 20% of the contract or $200,000, whichever is less." SPP § 13-405(c)(1)(ii). It is clear to us that the Universities need not mirror that exact cost-savings threshold, because S.B. 342 does not require strict compliance with SPP § 13-405. It is also clear that the Universities, at the very least, need to have some sort of process to evaluate whether departing from the ordinary preference for State employees is justified in light of the purposes behind the statute, including the goal of protecting State employees from layoffs when feasible and cost-efficient. It is somewhat less clear, however, whether each University would, as part of that evaluation, need to adopt a specific cost-savings threshold that is similar to the one in SPP § 13-405, even if it differs in some respects. The statute ultimately charges the BPW with deciding such questions.

Third, you suggested that the Universities might need to provide for review of service contracts for compliance with S.B. 342. To the extent that you are asking about review of a proposed service contract before it is signed, USM indeed requires the submission of each proposal to the USM Chancellor, who then decides whether to submit the proposal to the Board of Regents and, if so, shares the proposal with the Committee on Finance, for it to make a recommendation to the full Board of Regents. *See* Procedures for Satisfying the Requirements of Board of Regents Policy VIII-22.00 Policy on Service Contracts. To the extent that you are asking about an after-the-fact review of the resulting service contract, however, the USM policy and the Chancellor's procedures do not directly address that issue, which appears to be a difference as compared to SPP § 13-405. To be clear, SPP § 13-405 only makes service contracts "*subject to* a legislative audit to determine compliance with projected cost savings." SPP § 13-405(e)(1) (emphasis added). The fact that a contract might be subject to an audit does not mean that an audit is required in every

case.[19]  So the Universities certainly would not need to require an after-the-fact review of every contract, as that would be a stricter standard than the one imposed on units subject to SPP § 13-405.  It is for the BPW to decide, however, whether the express possibility for some after-the-fact review is necessary in order to "promote the purposes" of SPP § 13-402.[20]

Finally, we examine the requirement that the Universities' policies must, "to the maximum extent practicable, be similar" to SFP § 13-218.1.  Under that provision, each of the Universities has taken steps to provide affected employees with advance written notice of a proposed service contract and a reasonable opportunity to meet to discuss alternatives to the service contract, as set forth in SFP § 13-218.1.  In fact, each of the Universities has adopted a 60-day timeframe, the exact same timeframe provided under SFP § 13-218.1, although some of their policies—consistent with the language of S.B. 342—provide for 60 days whenever doing so is *practicable*, meaning that the policies might allow for less than 60 days' notice in limited circumstances.  *See* Morgan State MOU at

---

[19] Indeed, although H.B. 158 originally stated that "the legislative audit *required* under . . . this paragraph shall be completed prior to the expiration of the initial term of the service contract," H.B. 158, 2015 Leg., Reg. Sess. (first reader) (emphasis added), that provision was removed at the request of the legislative auditor so that auditors would "have discretion regarding the contracts selected for audit, since [they] do not have sufficient resources to audit every contract."  Letter from Thomas J. Barnickel III to Sen. Thomas M. Middleton and Del. Maggie McIntosh, at 1 (Mar. 17, 2015).  In light of that amendment, service contracts governed by Title 13, Subtitle 4 of the State Personnel and Pensions Article are "subject to" audit, but an audit is not required of every contract.  SPP § 13-405(e).

[20] On this point, for the sake of completeness, we note that, when one of the sponsors of S.B. 342 was asked during a committee hearing whether the bill would extend the requirement for an audit of projected savings to the Universities, he responded, "I would say, not extend; I would say we thought that we did that last year and this is cleaning that up."  *Hearing on S.B. 342 Before the Senate Educ., Health, and Envtl. Affairs Comm.*, 2016 Leg., Reg. Sess. (Feb. 16, 2016) (statement of Sen. Feldman).  That exchange could be read to suggest that this sponsor, at least, expected the Universities to have such requirements in their policies.  Of course, in "cleaning . . . up" the prior year's bill, the General Assembly chose to require the Universities to adopt procurement policies that "promote the purposes" of SPP § 13-402, rather than to expressly require a "similar" audit provision to the one in SPP § 13-405.  As such, it is ultimately up to the BPW to determine whether a similar provision providing for the possibility of after-the-fact review is required to "promote the purposes" of the preference for State employees.

30 (providing the University will "*to the maximum extent practicable*" provide notice "at least sixty (60) days" in advance (emphasis added)); St. Mary's College MOU at 10 (providing for notice "*at its earliest opportunity*, but normally no later than sixty (60) days in advance" (emphasis added)). While such processes appear likely to satisfy this aspect of S.B. 342, the BPW will ultimately make that determination once they are incorporated into the Universities' procurement policies and submitted for approval.

## III
## Conclusion

In our opinion, as a procedural matter, S.B. 342 obligates USM, Morgan State, and St. Mary's College to amend their procurement policies and submit them to the AELR Committee for review and to the BPW for approval. Substantively, the Universities have flexibility to develop a process that is not identical to SPP § 13-405 and that meets each of their unique needs, but the process must be similar enough to SPP § 13-405 so as to protect State employees from layoffs associated with outsourcing when it is feasible and cost-efficient to do so and to prevent the State from paying more for services its employees are available to perform. The Universities' policies must also, "to the maximum extent practicable, be similar" to SFP § 13-218.1 by providing affected employees with advance written notice of a proposed service contract and a reasonable opportunity to meet and discuss alternatives to the contract. Although each of the Universities has taken steps to address S.B. 342, none of them amended their procurement policies and submitted them to the BPW for approval. Ultimately, the BPW will have to decide in the first instance whether, and to what extent, each of the Universities' policies complies with S.B. 342.

Brian E. Frosh
Attorney General of Maryland

Alan J. Dunklow
Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice